**Leila A. GRAY, et al., Appellants,**

v.

**Arthur Lee BROCK, M.D., and Frank H. Lewis, M.D., Respondents.**

**No. WD 39065.**

Missouri Court of Appeals, Western District.

May 17, 1988.

Duke W. Ponick, Jr., Kansas City, and Guy G. Rice, Independence, for appellants.

Darwin E. Johnson (Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, of counsel), Kansas City, for respondents.

Before PRITCHARD, P.J., and GAITAN and COVINGTON, JJ.

PRITCHARD, Presiding Judge.

Appellants brought suit in medical negligence for the wrongful death, on January 18, 1982, of their decedent, James C. Gray, alleged to have been the result of respondents' negligence during his hospitalization, in failing to order either a nasogastric tube or a tracheostomy for Mr. Gray (to prevent aspiration of gastric contents).

One issue, claimed to have been error, because not supported by evidence, was the giving of an instruction which submitted that Mr. Gray was contributorily at fault because he knew that his diabetes, which he had since 1976 and for which he had been hospitalized at times until 1982, was out of control from January 15, 1982 through January 17, 1982, but he negligently failed to seek medical attention which caused or contributed to cause his death. A jury returned a verdict for appellants for $60,000, and assessed fault at 13% to Dr. Lewis; 5% to Dr. Brock; and 82% to Mr. Gray.

Dr. Brock had been Mr. Gray's general physician since 1980 at which time he attempted to regulate the diabetes by diet. He explained to Mr. Gray that normal blood sugar ranges between 120 and 150 and advised him to take test strips of his urine four times a day to check for blood sugar. This is a specially impregnated tape which when submerged in urine changes color depending upon the level of sugar in the urine. A one plus reading indicates that blood sugar is between 180 and 220, which is average. Four plus is as high as the test strip goes. In January, February and March, 1981, Mr. Gray's sugar level was two and three plus according to the urine test strips. Dr. Brock ex-

plained this to mean that Mr. Gray's diabetes was "out of control".

Apparently Mr. Gray had been using the urine test strips prior to the last time he saw Dr. Brock on April 13, 1981. At that time an appointment was made by Dr. Brock to see Mr. Gray for May 27, 1981, but Mr. Gray did not keep it. The next time Dr. Brock saw Mr. Gray was on January 18, 1982, at the Independence Sanitarium and Hospital.

On the first office visit, on May 7, 1980, with Dr. Brock, both Mr. and Mrs. Gray were present. Dr. Brock discussed with them the disease of diabetes advising them in accordance with his trial testimony which was this with regard to fatality from the disease: "Q How does this fatalness occur? What mechanical processes go on in the body when left untreated that causes this death? A What happens is the blood sugar goes higher and higher and higher, and because of that sugar is a—you can tell sugar is a thing that affects the concentration of the blood. You begin to exhibit the really classic symptoms of diabetes, which is lots and lots of urine because the sugar spills over and no longer can the kidneys hold back the sugar content, and you begin to lose sugar in the urine, and along with every molecule of sugar you have a molecule of water that follows it along, and so you lose a lot of urine, and because of that you become dehydrated so your thirst increases and so you have polyuria, which is lots of urine output, polydipsia, which is drinking frequently, and ultimately the loss of urine exceeds the ability of the body to replace fluid and your serum becomes so concentrated that you go into a coma and die."

On the last occasion in April, 1981, when Dr. Brock saw Mr. Gray in his office, there was a prolonged discussion. Dr. Brock had not seen him since he had gone to the Mayo Clinic seven months before, where nothing of significance was found. Mr. Gray's blood sugar was over 400 at the time Dr. Brock saw him in April, and Mr. Gray acknowledged that he had not been following his diet which was the reason for the high blood sugar count. Dr. Brock told him that he was going to have to put him on Tolinase, an oral medication, but Mr. Gray said that he could not handle Tolinase. Dr. Brock told him then that he was going to have to be on insulin but Mr. Gray pleaded with him not to be on it again and agreed to start jogging and exercising and to restrict his diet, to which Dr. Brock agreed and asked him to come back in five weeks or so to see if he had been able to drop his weight significantly—from 160 pounds to 135 pounds where he was not going to require insulin. As noted, Mr. Gray did not keep that appointment.

According to Mrs. Gray, after the last office visit with Dr. Brock, Mr. Gray, who generally weighed 165 to 170 pounds, deliberately took some weight off by the exercise program and a low calorie diet, getting down to 150 or 155 pounds, but sometimes getting back up overweight, having then to go back on the 1,000 caloric diets. Mr. Gray walked briskly but did not feel like jogging, and he used an exercise cycle in the home for the weight control program.

On Monday, January 11, 1982, Mrs. Gray started to come down with the flu and came home from work that day. Flu seemed to be a regular yearly occurrence in the Gray family. Mrs. Gray stayed in bed most of that week, and Mr. Gray was then seeing to the household chores and looking after their youngest son, Robby. Late Wednesday afternoon, January 13, 1982, Mr. Gray came home and said he was beginning to feel a little achy and went to the family room and laid down fully dressed. Mrs. Gray tried to stay away from him, feeling that he was taking the flu like she had. Toward the end of that week, he started to get nauseated and vomited on Saturday and Sunday, which was the worst day. Sunday evening, Mr. Gray stayed up until about 11:00 watching television with his son, Robby.

On Sunday morning, some family members were visiting the Grays and suggested that both go to see a doctor. Mr. Gray said that they would wait until Monday to see how he felt. When Mr. Gray started vomiting, he started an intake of fluids which were thereby lost. Mrs. Gray testified that

they were both drinking a lot of fluids because that was what they always did when they got the flu, "always consumed a lot of juices". Mr. Gray would have done that because he thought that was the way to doctor yourself if you had the flu.

On Monday morning, January 18, 1982, Mrs. Gray found her husband at the back door wearing the boy's coat and pajamas and appearing to be somewhat confused and disoriented. She took him back to the divan, dressed him and took him to the hospital in the family car.

Mr. Gray arrived at the emergency room of the Independence Sanitarium and Hospital at 10:23 a.m. on January 18, 1982, being admitted by Dr. Brock. The physician in charge of the emergency room, Dr. Robert Carrillo, M.D., and Nurse Marilyn Nyberg stabilized Mr. Gray and started improving his condition by giving insulin, starting him on I.V. fluids and giving him supplementary oxygen which markedly improved his blood oxygen level. He was discharged from the emergency room to be taken to ICU at 11:35 a.m., at which time his condition had been upgraded from "poor" to "fair". It was Dr. Carrillo's opinion that Mr. Gray was not moribund or lying at death's door but had shown a gratifying response to therapy—his blood sugar was coming down, he was being rehydrated and his oxygenation was improving. At no time prior to his being taken to ICU did he appear to be at risk for aspiration of his gastric contents, which is the inhalation of stomach contents into the lungs following vomiting, which is also a dread event associated with a mortality rate as high as 70%. The cause of death was certified by Dr. Lewis to have been aspiration of gastric contents into the lungs.

About the time Mr. Gray was transferred to ICU, Dr. Lewis entered the case as the treating physician with Mrs. Gray's assent. At noon on January 18, 1982, Dr. Lewis noted in his own handwriting that Mr. Gray had a nonketotic hyperosmolar diabetic coma, and he had a three day history of polydipsia (large intake of fluids) and polyuria (frequent urination) which information was apparently taken from Mrs. Gray on

the chart of Nurse Westmoreland. Dr. Lewis then regarded Mr. Gray as being in fair condition and treatable. Dr. Brock, who saw him for about 5 minutes between noon and 12:45 and again at 1:30 p.m. for 5 to 10 minutes, did not regard him as being terminally ill, and believed he was treatable. Clinical Care coordinator, Delores Robertson, who saw Mr. Gray at around 2:45 or 2:50 p.m., did not believe he was moribund or terminal. Appellants' expert witness, Dr. Neil A. Crane, a board certified physician in internal medicine and infectious diseases, testified that every condition Mr. Gray had was reversible and treatable including his hyperosmolar diabetic state and a blood borne infection (septicemia) which was not isolated in the laboratory until after Mr. Gray expired, and was not included in the certificate as a cause of death.

■ Instruction No. 7, the giving of which appellants contend was error is this:

"In your verdict you must assess a percentage of fault to James C. Gray, whether or not either defendant was partly at fault, if you believe:

First, James C. Gray knew on January 15, 1982 and through January 17, 1982 that his diabetes was out of control, and

Second, he failed to seek medical attention, and

Third, James C. Gray was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause fatal injury to James C. Gray.

The term 'negligent' or 'negligence' as used in this instruction means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

Appellants say that there was no substantial evidence that Mr. Gray had actual knowledge that "his diabetes was out of control" on January 15, 16 and 17, 1982. In this contention, they are correct. The evidence is, from Mrs. Gray, that after Mr. Gray last saw Dr. Brock in April, 1981, he carried on a regimen of walking, using an exercise cycle and diet to control his

weight. There is no evidence that during the approximate nine month period that he had any indication of an elevated blood sugar count—the record is bare as to whether he continued the use of the urine test strips during that time so as to indicate increased blood sugar. During all this time, Mr. Gray attended to his employment as a building superintendent.

It was not until after Mrs. Gray became ill with the flu that Mr. Gray came home early on January 13, 1982, feeling achy. According to the son, Robby, Mr. Gray told him he had become nauseated and had vomited on Friday afternoon, also vomiting on Saturday and Sunday, after which his intake of fluids started picking up a little bit more than usual, like Mrs. Gray had been doing all week, she being sick in bed.

The only evidence that bears upon the knowledge of Mr. Gray *himself* as to his condition from January 15 to January 18 is that he thought he had the flu, which was associated with nausea and vomiting. There is no evidence that he realized that his increased fluid intake and urination was attributable to an activation of his diabetes. According to the family practice, the flu was treated by an increased intake of fluids, which would occur by reason of the vomiting. There is no evidence that Mr. Gray knew that his blood sugar count was elevated which was caused by his diabetes as indicated by the increased intake of fluid and frequent urination. Appellants further contend that there was no evidence that the diabetes being out of control directly caused or contributed to cause Mr. Gray's death. In this, they are also correct. Although it is true that upon arrival at the hospital emergency room Mr. Gray's blood sugar was thereafter reduced from 1265 to around 900, as the evidence showed, no doctor, including respondents' expert witness, Dr. Kerby, testified that the cause of death was the diabetes being out of control. On the contrary, both respondents testified that Mr. Gray's condition was treatable, Dr. Lewis regarding him as being in fair condition, and Dr. Brock did not regard him as being terminally ill. Dr. Crane testified that every condition that Mr. Gray had was reversible and treatable.

Notably, both respondents acknowledged that the cause of Mr. Gray's death was aspiration of his stomach contents. In the respects above mentioned, the giving of Instruction No. 7 is reversibly erroneous because its submissions were not supported by the evidence. A new trial must therefore be ordered. See *Brassfield v. Sears*, 421 S.W.2d 321, 323[1, 2] (Mo.1967); *Citizens Bank of Windsor v. Landers*, 570 S.W.2d 756 (Mo.App.1978); and *Heshion Motors, Inc. v. Western International Hotels*, 600 S.W.2d 526 (Mo.App.1980).

■ Appellants also say that the inclusion in Instruction No. 7 of the phrase "diabetes out of control" gave the jury a roving commission to speculate and determine on its own what the phrase meant or what issues were compressed in it, and "It wholly fails to submit sufficient ultimate issues to make it clear what *facts* the jury must find to justify and assess comparative fault on the part of James C. Gray." If, on retrial, there is evidence that the diabetic condition caused or contributed to cause Mr. Gray's death, and if there is evidence that he actually knew that his increased intake of fluids and frequent urination was attributable to an elevated blood sugar count (as Dr. Brock had advised him), then the facts of increased fluid intake and urination should be incorporated in the instruction on retrial to demonstrate the means of knowledge that the diabetes was out of control. Thus, any charge that the instruction gave the jury a roving commission might be obviated.

Respondents' expert witness, Dr. Gerald R. Kerby, M.D., gave his opinion that Mr. Gray died of pulmonary edema secondary to streptococcal septicemia. The jury did not accept that testimony because it found percentages of fault against respondents upon appellants' theory that Mr. Gray died of aspiration of his stomach contents occasioned by respondents' negligence in failing to insert a tracheostomy tube or nasogastric tube to prevent gastric contents from getting into the lungs. Dr. Kerby's opinion, if there was error to receive it, is therefore harmless on the present appeal. Because, however, the issue may again

arise on new trial, it will be briefly addressed.

■ Dr. Raymond J. Caffrey, M.D., staff pathologist, performed the autopsy of Mr. Gray, concluding that he had died of aspiration of stomach contents. Among his findings was that the weight of his lungs for the left, 650, and for the right, 710, grams, a total of 1360 grams, and sections of the lungs were blue-black in color, exuding copius amounts of frothy fluid. Dr. Kerby considered this data, and a blood culture report, which Dr. Caffrey did not have at the time of autopsy, showing Mr. Gray had a "beta hemolytic streptococcus Group A" infection, which is a bacteria in the bloodstream. Dr. Kerby computed the amount of fluid in Mr. Gray's lungs to have been about one pint by taking their actual weight and deducting from it the average size of the lungs of 900 grams which could be expected in a person of Mr. Gray's size and weight. He also considered slides of the alveoli which showed extensive pulmonary edema. He concluded that the source of the fluid was the rupturing of red blood cells caused by bacterial toxins associated with the septicemia, and the fluids came from the bloodstream rather than from aspiration of gastric contents. He concluded that because of the overwhelming bacterial infection of streptococcal septicemia and the pulmonary edema, even assuming that Mr. Gray had not aspirated, his life could not have been saved. It is apparent from Dr. Kerby's testimony that he based his opinion on facts in evidence and his medical knowledge, and therefore it did not offend the rule in *Craddock v. Greenberg Mercantile, Inc.*, 297 S.W.2d 541, 548 (Mo. 1957), and like cases, that an expert witness' opinion must have a substantial basis in the facts actually established. Dr. Kerby's testimony, if presented in the same posture, will not be inadmissible upon new trial.

Appellants' last point is that respondents' counsel committed error in arguing the issue of burden of proof to the jury. That issue need not be here addressed because it may not recur on new trial.

Because of error in giving Instruction No. 7, as noted, the judgment is reversed and the case is remanded for new trial.

All concur.