Bobby Joe **STONE** and Ginger Gail Stone, Plaintiffs–Appellants,

v.

**DUFFY DISTRIBUTORS, INC.,** and Paul James **Trim,** Defendants–Respondents.

No. 16107.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 30, 1990.

Motion for Rehearing or to Transfer to Supreme Court Denied Feb. 21, 1990.

Application to Transfer Denied April 17, 1990.

David W. Ansley, James B. Condry, Hall, Ansley, Carmichael & Gardner, Springfield, for plaintiffs-appellants.

Jon Dermott, Ron Mitchell, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for defendants-respondents.

MAUS, Judge.

In this action appellant, Bobby Joe Stone (Stone), sought recovery for injury he claims resulted from a collision of his pickup truck and three beer kegs. Appellant Ginger Gail Stone (Ginger) seeks recovery for loss of consortium because of such injury. The respondents' defense was that Stone's disability did not result from the accident and that it resulted in whole or in part from his failure to follow the instructions of his doctors. The latter defense was submitted in a comparative fault instruction. A jury fixed Stone's damages at $40,000 and determined his fault to be 80%. It fixed Ginger's damages at zero. The appellants state five points on appeal.

The following is a summary of the evidence sufficient for the consideration of those points. At the time of the accident, the appellants lived on a farm in Stone County. They operated a dairy. On June 17, 1987, Stone was driving a pickup truck north on Highway 13 in Stone County. He was accompanied by his daughter, Niki. As Stone was approaching and entering a sharp curve, he was meeting a southbound truck owned by respondent Duffy Distributors, Inc., and driven by its employee respondent, Paul James Trim. The truck was carrying 48 kegs of beer. Each keg contained 15.5 gallons of beer and weighed approximately 165 lbs. As the truck entered the curve, it swerved to regain its side of the center lane. When it did, a door on the left side of the truck opened and a number of kegs fell into the northbound lane of Highway 13. Stone could not swerve left because of the truck. He could not swerve right because of a deep ditch. He attempted to make an emergency stop, but his pickup hit three kegs.

The appellants presented evidence tending to establish a violent collision. On the other hand, the respondents emphasized evidence tending to minimize the severity of the collision. That evidence includes testimony to the following effect. That at the time of the collision Stone's pickup was virtually stopped. The damage to the three kegs of beer was so slight, they were delivered to the customers for their use. Of course, it is trite to observe that this court must consider the jury resolved that conflict in evidence in favor of the respondents.

"An appellate court does not weigh the evidence. We view the evidence and all

inferences therefrom in the light most favorable to the verdict. Inconsistencies are resolved in favor of the prevailing party and all of plaintiff's evidence must be disregarded unless it aids the defendant's case where there is a verdict for the defendant." *Lauber v. Buck,* 615 S.W.2d 89, 91 (Mo.App.1981).

That principle is applicable to other conflicts in the evidence, including evidence concerning Stone's subsequent activities and the medical testimony. *Milam v. Vestal,* 671 S.W.2d 448 (Mo.App.1984).

Stone did not complain of injury at the scene of the accident. Respondent Trim asked Stone if he was hurt, and Stone replied that he was not. Stone accompanied his daughter to the hospital. At the hospital, he complained of neck and back pain. Cervical X rays were negative.

On June 19, 1987, two days after the accident, Stone consulted Doctor Robert J. Richardson, a chiropractor with his office in Lakeview in Stone County. His complaints included low back pain. Stone saw Dr. Richardson on twelve occasions between June 19 and July 20, 1987. He subsequently saw Dr. Richardson on September 23, 1987 and October 21, 1987. He was treated by chiropractic adjustments. Dr. Richardson's diagnosis was that Stone had suffered an injury to the soft tissues in his low back.

On July 23, 1987, Stone consulted Robert Patrick O'Brien, M.D., a board certified orthopedist in Branson. Stone told Dr. O'Brien of the accident. He related that he was a dairyman and did a lot of strenuous work and that his pain was worse towards the end of the day. His complaint was of back pain. Dr. O'Brien's diagnosis was chronic lumbar strain. Dr. O'Brien prescribed anti-inflammatory medication and gave Stone instructions for stretching exercises for his back.

On August 25, 1987, Stone saw Charles Spears, M.D., in Branson. Dr. Spears' diagnosis was that Stone had ligamental strain. Dr. Spears referred Stone to John Flint Ferguson, M.D., a board certified neurosurgeon, in Springfield. Stone saw Dr. Ferguson on October 22, 1987.

Following an examination, Dr. Ferguson's diagnosis was that Stone had "acute and chronic lumbosacral strain" consisting of an injury to the muscles, tendons and joints in the lower back. On Dr. Ferguson's recommendation, Stone had a spinal CT scan at St. John's Hospital. Dr. Ferguson examined a film of the scan. He did not think it "demonstrate[d any] significant clinical abnormality" that he could appreciate. Dr. Ferguson told Stone that he had a lower back strain. Dr. Ferguson reported the same thing to Dr. Spears. However, a radiologist read the film of the CT scan. His report was that the scan showed "slight anterior bulging of the L3–4 and L4–5 intervertebral disc." Dr. Ferguson did not see the report.

Apparently for the purpose of preparation for litigation, Stone obtained his medical records from St. John's. He discussed the report from the radiologist with Dr. Ferguson. February 8, 1988, Stone was admitted to St. John's for a myelogram and another CT scan. The myelogram performed at that time showed "Ruptured lumbar disc L4–5, left, central." Stone remained in the hospital for physical therapy until February 13, 1988. He improved during his hospitalization. His discharge disposition was "The patient will be seen in the future on a prn basis should the pain recur." Dr. Ferguson did not recommend surgery because of Stone's occupation. There is evidence Stone had a "brief return visit" to Dr. Ferguson on August 2, 1988.

At the request of Stone's attorneys, Garth Russell, M.D., board certified orthopedist in Columbia, Missouri, examined Stone. Dr. Russell took a history, examined Stone, and reviewed all of the film that had been taken. It was his opinion that Stone had a herniated disc, not completely ruptured. He recommended surgery because it would lessen the pain in Stone's legs, but not alleviate the back pain. In Russell's opinion, Stone's injuries are permanent and disability will continue through the remainder of his life even if he has surgery. On the basis of a hypothetical question, it was Dr. Russell's opinion that the condition in Stone's back was

caused by the collision with the beer kegs. The hypothetical question made no reference to the examinations and diagnoses of Dr. Richardson or Dr. O'Brien. It hypothesized the positive myelogram and CT scan of February 1988. It did not include any hypotheses concerning Stone's activities or work subsequent to the accident. On cross-examination, Dr. Russell said Stone told him that after the accident Stone "could only supervise" his farming. It was Dr. Russell's opinion that if Stone had continued to do heavy work such as lifting, it could cause the herniated disc to bulge or become larger.

At the request of the respondents, Dr. Charles Ash, a board certified orthopedist in Springfield, examined Stone. Dr. Ash found that Stone had a herniated disc at L4–5 with slight asymmetry. In response to a question hypothesizing the collision, Dr. Ash stated that in his opinion the collision would not have caused a herniated disc injury. He testified that lifting a bale of hay, weighing 100 lbs, would be more apt to cause such an injury than a vehicular collision.

Dr. O'Brien testified that Stone did not have a bulging, ruptured or partially-ruptured disc when he examined Stone in July, 1987.

There was conflicting evidence concerning Stone's work and activities following the accident. The appellants offered evidence that tended to minimize that work. The respondent emphasized evidence that after the accident Stone performed manual labor of the type that would aggravate a soft tissue back injury and could cause a bulging or herniated disc. Examples of that evidence will be subsequently noted.

The appellants' first point is that the trial court abused its discretion in allowing the respondents, on the morning of trial, to amend their answer to include an allegation the appellants failed to mitigate damages, "because it injected a totally new issue into the case on the morning of trial which resulted in great prejudice to appellants." Rule 55.33(a) in part provides: "Otherwise, a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

"A trial court has broad discretion when determining whether to permit an amendment of the pleadings, and the court's decision will not be disturbed on appeal unless there is an obvious and palpable abuse of such discretion." *Fisher v. McIlroy*, 739 S.W.2d 577, 580 (Mo.App.1987).

Before *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc 1983), the following proposition was firmly established.

"We find that wherever this court has specifically considered the matter, it has held that in personal injury cases evidence in mitigation of plaintiff's damages is admissible under a general denial." *Stipp v. Tsutomi Karasawa*, 318 S.W.2d 172, 175 (Mo.1958).

Also see *Love v. Park Lane Medical Center*, 737 S.W.2d 720 (Mo. banc 1987).

*Gustafson v. Benda*, supra, mandates that "[i]nsofar as possible this and future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act...." *Id.* at 15. Uniform Comparative Fault Act Section 1(b) in part provides: The term fault "also includes ... unreasonable failure to avoid an injury or to mitigate damages." See *Love v. Park Lane Medical Center*, supra.

As a general rule, a responsive pleading must affirmatively assert an opposing party's fault, as that term is used in the Uniform Comparative Fault Act, to raise that issue. Missouri Comparative Fault Treatise—Theory and Practice, § 5.3 (UMKC/CLE 1989); 57B Am.Jur.2d Negligence, § 1270. Whether or not *Gustafson* makes it necessary to affirmatively plead failure to mitigate damages to raise that issue, is not settled in this state. See *Young v. Kansas City Power and Light Co.*, 773 S.W.2d 120 (Mo.App.1989).

It is not necessary to decide that question to determine the appellants' first point. The record otherwise establishes that point has no merit. The respondents' counsel stated that he sought the amend-

ment out of an abundance of caution. He added that he did not think mitigation of damages was an affirmative defense that needed to be pleaded. He further stated

> "this case turns on the question of the extent of the injuries of the Plaintiff and whether he did anything, uh, to cause his injury to be aggravated. Uh, that issue has been present at least from the first medical deposition that I can recall and has continued to the present day."

The record demonstrates that to be true.

The appellants' counsel did not dispute that statement. His responsive remarks included the following:

> "I agree with Jon [respondents' counsel]. I don't think that mitigation of damages is an affirmative defense."

> \*　　\*　　\*　　\*　　\*　　\*

> "I think that he [respondents' counsel] and I operated under Gustafson versus Benda. Whatever that case adopts, I think that's what we're acting under. I'd be shocked if our minds were different."

> \*　　\*　　\*　　\*　　\*　.　\*

> "Whatever Gustafson permits, I think that's what he and I have agreed he's permitted to plead."

The trial court considered these statements then determined the requested amendment would be permitted.

These comments demonstrate counsel for both parties had proceeded as if mitigation was an issue. As stated, that understanding is reflected in the record. That being true, those comments and the record establish the appellants were not prejudiced by the amendment and the trial court did not abuse its discretion in permitting the amendment. Cf. *Condos v. Associated Transports, Inc.*, 453 S.W.2d 682 (Mo.App. 1970); *Conchola v. Kraft*, 575 S.W.2d 792 (Mo.App.1978).

The appellants' second point is that the trial court abused its discretion in allowing the respondents to "use the expert opinions of Dr. Robert Patrick O'Brien, because respondents failed to designate Dr. O'Brien as an expert witness in interrogatory answers and thus failed to comply with Missouri Rule of Civil Procedure 56.-01(e)(1)(B)." That point has the following background. As noted, Stone consulted O'Brien as a treating physician. Six days before trial, without objection, the respondents took the deposition of O'Brien. Before trial commenced, the appellants made an oral motion in limine to prevent the respondents from using that deposition. That motion was denied. During trial, the appellants announced: "[W]e've elected to go ahead and read the deposition of Dr. O'Brien." The deposition was then read.

The respondents argue the point has no validity for two reasons. First, the use of the deposition could not constitute surprise and the trial court did not abuse its discretion in permitting its use. See *Turner v. Fuqua Homes, Inc.*, 742 S.W.2d 603 (Mo. App.1987); *Dane by Dane v. Cozean*, 636 S.W.2d 87 (Mo.App.1982). Second, the appellants did not preserve this point by a contemporaneous objection when the deposition was offered. See *Anderson v. Rojanasathit*, 714 S.W.2d 894 (Mo.App.1986).

It is not necessary to consider the validity of these arguments. Even assuming Dr. O'Brien was an "expert witness", the appellants' position is unsound.

> "There is no prohibition to calling an opposing party's expert witness at trial. If the party calling such witness has failed to previously discover through 56.-01(b) the facts known by and opinions of such witness, then of course that party runs the risk that he will be bound by unfavorable testimony. In the present case, respondents did, in fact, discover the witnesses' identities as well as facts and opinions through the taking of depositions. The time to object to their testimony was prior to the taking of such depositions." *Turner v. Fuqua Homes, Inc.*, supra at 610.

Moreover, Rule 56.01(e)(1)(B), upon which the appellants rely, is not applicable. Dr. O'Brien was not engaged in anticipation of litigation. He was a participant in the diagnosis and treatment of Stone.

> "These were not 'expert witnesses' in the sense that they were engaged by a

party in anticipation of litigation to testify to scientific or technical matters. They were observers and participants in the events and transactions of the case. If some of their testimony incidentally called upon their learning and experience for conclusions and opinions, and could in that sense be called 'expert testimony,' that does not make them 'expert witnesses' within the meaning of Rule 56.-01(b)(4)." *Owen v. City of Springfield,* 741 S.W.2d 16, 20 (Mo. banc 1987), cert. denied, 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988).

Also see *State ex rel. Stufflebam v. Appelquist,* 694 S.W.2d 882 (Mo.App.1985). The appellants' second point is denied.

The appellants' next point is that the trial court erred in giving Instruction No. 10, which reads:

"In your verdict you must assess a percentage of fault to plaintiff Bobby Joe Stone, whether or not defendants were partly at fault, if you believe:

First, plaintiff Bobby Joe Stone failed to follow the instructions of his doctors, and

Second, plaintiff Bobby Joe Stone was thereby negligent, and

Third, such negligence of plaintiff Bobby J. Stone caused or directly contributed to cause any damage plaintiff may have sustained."

The appellants do not question the propriety of submitting Stone's contributory fault by failing to mitigate damages in a separate instruction. In similar circumstances, it was found not to be error to submit that issue by an instruction in substantially the same pattern as Instruction No. 10. *Love v. Park Lane Medical Center,* supra. The appellants' attack upon Instruction No. 10 is limited to two contentions.

■ The appellants first contend there was no evidence to support Instruction No. 10. In part, they premise the contention upon an exercise in semantics. They cite differences in the dictionary definitions of "instructions", "advice" and "recommend". They then argue there may be evidence of "advice" or "recommendations" but no evidence of a " 'precept; a direction calling for compliance; order' ".

Whether or not the language of an instruction adequately submits an issue of an ultimate fact to the jury is not to be considered in the abstract. The adequacy of the language is to be determined in the context of the evidence and how the issue submitted has been developed during trial. "Juries are credited with having common sense and an average understanding of our language." *Clark v. Skaggs Companies, Inc.,* 724 S.W.2d 545, 554 (Mo.App.1986). When so considered, it is obvious the term "instructions" meant to the jury what his doctors told Stone he should do to alleviate the injury and condition for which he sought treatment.

In determining if there is evidence to support Instruction No. 10, this court must consider the evidence most favorable to that instruction, with all reasonable inferences and disregard the appellants' evidence unless it supports the submission in that instruction. *Welch v. Hyatt,* 578 S.W.2d 905 (Mo. banc 1979). Observing that standard, this court finds an abundance of evidence of Stone's failure to follow his doctor's instructions and that such failure contributed to cause the condition of which he complains. That evidence includes the following.

Dr. Richardson's letter of August 22, 1987, states that his diagnosis of Stone's condition was: "1) Acute post traumatic lumbar and lumbosacral strain/sprain with associated deep and superficial muscle spasms, myofascitis, and radiculitis, radiating the trajectory of the right lumbosacral plexus. 2) Acute cervical strain resulting from a whiplash type of hyperkinesis." Dr. Richardson added: "It is my considered opinion that it will be necessary for Mr. Stone to obtain reliable help with his farm chores for a period of not less than six months in order for his spinal structures to gain maximum improvement." It is a reasonable inference Dr. Richardson told Stone of his diagnosis and what would be necessary for his maximum improvement. Dr. O'Brien testified that he went over the exercises with Stone and provided him with

a book with exercises in it and instructed him on how to do the exercises. Dr. O'Brien further recommended that Stone take some time off from his strenuous activities and try to give his back a chance to heal. He made those recommendations on Stone's first visit in July of 1987.

On August 13, 1987, Dr. O'Brien wrote a letter "To Whom It May Concern" relative to Stone's condition. The letter was written "[i]n order to allow him to get some help on the farm so he could rest his back till improved". Stone had a son-in-law in the Navy. The letter includes the following.

"He has had substantial lower back pain since that time. In his line of work he has to do a lot of heavy lifting and milking and since his is a one man operation he has been unable to rest. He was first seen by me July 23rd, 1987 at that time he had moderate hamstring spasm with normal reflexes, manual muscle testing and sensory examination. His x-rays were normal. With a diagnosis of an acute lumbar syndrome, I recommended strongly that he rest. He could not do that because of his occupation."

The letter was given to Stone. Stone acknowledged instructions from these doctors in the following question and answer.

"Q Let's take a period of time, uh, after the accident from, uh, uh, June to the next two or three months. What, what were you doing?

A I, uh, I did, I tried not to do anything that, uh, the doctors specifically said, mainly no lifting, or lighten up...."

There is a plethora of evidence that Stone did not follow those instructions. That evidence is found in the records of Dr. Richardson and Dr. O'Brien. Stone "testified that he had not done any heavy lifting since the accident, he had not lifted a bale of hay since the accident: 'I tried not to do anything that, uh, the doctors specifically said....'" However, when he gave his deposition in September 1987 in another case, he testified that he worked every day and fed cattle every day and did not say anything about being physically unable to

feed the cattle. In that lawsuit, he also testified that he fed hay by setting the hay bales up on the back of the manger and then breaking them apart.

Contrary to appellants' argument, there is also evidence from which a jury could find Stone's failure to follow those instructions did contribute to his damages. When seen by Dr. Richardson and Dr. O'Brien, Stone did not have the classic symptoms associated with a herniated disc. Dr. O'Brien testified that in July 1987, Stone did not have the herniated disc shown in the later films. All doctors agreed that manual labor would aggravate Stone's back problems. It was the opinion of Dr. Ash that it was more probable that lifting a bale of hay caused the herniated disc rather than the collision. Dr. Russell testified that if Stone had continued heavy work, it would cause the herniated disc to bulge or become larger. A further discussion of the evidence is not necessary. The examples of the evidence cited demonstrate Instruction No. 10 was supported by the evidence.

■ Appellants also present an argument not covered by the point. That argument is that Instruction No. 10 is erroneous because it did not require Stone to have knowledge of his herniated disc and there was no evidence of such knowledge until February of 1988. They cite *Gray v. Brock*, 750 S.W.2d 696 (Mo.App.1988). *Gray* holds that before a plaintiff can be found at fault for not seeking treatment because his "diabetes was out of control", the plaintiff must know or have reason to know his diabetes was out of control.

Appellants' argument, based on *Gray*, does not aid them for two reasons. First, there was evidence Stone did not have a herniated disc in July 1987 when he saw Dr. O'Brien. There was also evidence that Stone's subsequent failure to follow his doctors' instructions resulted in that condition. The jury accepted that evidence. Second, that argument is not valid regardless of whether Stone's activities caused or aggravated the disc condition. The argument ignores the plain meaning of Instruction No. 10. That meaning refers to what Stone was told by his doctors. When he

was told, he knew. He acknowledged this when he testified, "I tried not to do anything that, uh, the doctors specifically said...." Measured by the common sense standard of *Clark,* Instruction No. 10 requires the jury to find Stone knew of the instructions told to him by his doctors, he negligently failed to follow those instructions and that failure caused or contributed to cause Stone's condition.

The appellants' final contention concerning Instruction No. 10 is that it gave the jury a "roving commission." They argue "it failed to submit the ultimate fact that respondent was hypothesizing what Bobby Stone did or omitted to do which caused the herniated disc."

Rule 70.02(e) in part provides: "[W]here there is no applicable MAI ... such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." See *Doolin v. Swain,* 524 S.W.2d 877 (Mo. banc 1975). " 'Admittedly, our courts have been unable to fashion precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts....' " *Grindstaff v. Tygett,* 655 S.W.2d 70, 73 (Mo.App. 1983). In making that determination, the following observation is relevant: "MAI contemplates that the jury will be properly advised by the argument of counsel concerning details." *Bayne v. Jenkins,* 593 S.W.2d 519, 531 (Mo. banc 1980). "The criteria in determining whether an instruction is correct or fails is whether an average juror would correctly understand the applicable rule of law, and whether a jury was not or could not be confused or misled, resulting in prejudice to one of the parties." *Wilson v. Bob Wood & Associates, Inc.,* 633 S.W.2d 738, 751 (Mo.App.1981).

There was detailed evidence concerning what the doctors told Stone to do or not to do. There was also much evidence concerning what Stone did. To hypothesize the details of the evidence on those issues in the instruction would be precisely what Rule 70.02(e) condemns. Instruction No. 10 does hypothesize the ultimate facts average jurors would reasonably believe they had to find from the detailed evidence presented to them.

The appellants cite *Grindstaff v. Tygett,* supra. That case holds that an instruction, in a malpractice action, which authorized a jury to find that a described procedure was "not medically proper" was error. *Grindstaff* does not aid appellants. That instruction did not define that term. It did not hypothesize the ultimate facts which would permit a lay jury to reach a medical conclusion of "not medically proper." Instruction No. 10 did hypothesize the ultimate facts the jury had to find to determine Stone was negligent. The submission of Instruction No. 10 is comparable to the approved submissions of "omitted to state a material fact", *Bayne v. Jenkins,* supra, and " 'to have moved to a place of safety' ", *Miller v. Hanna,* 757 S.W.2d 301 (Mo.App.1988). The appellants' point concerning Instruction No. 10 has no merit and is denied.

■ The appellants' next point is the trial court erred in allowing the respondents to cross-examine Dr. Russell concerning what Dr. Ferguson meant by certain entries in his medical records. That point has the following background. As noted, Dr. Russell examined Stone at the request of appellants' counsel. Dr. Russell's video tape deposition was taken at the instance of the appellants. Appellants' direct examination of Dr. Russell included a hypothetical question which elicited an opinion that Stone's complaints resulted from the accident. That hypothetical question omitted any reference to Stone's activities following the accident. The cross-examination of which the appellants complain occurred during that deposition. That cross-examination is exemplified by the following dialogue.

"Q. All right. Now, the doctor also notes that Mr. Stone has not rested. What does that indicate to you?

A. Well, it indicated he continued to work."

It may be that such cross-examination was relevant as a foundation for the respondents to subsequently ask Dr. Russell if Stone's continued working could have caused the disc to bulge. However, it is

not necessary to consider the merits of the appellants' objections to the cross-examination made when the deposition was taken.

During their case in chief, the appellants announced "we would offer into evidence Plaintiffs' Exhibit 31". Exhibit 31 is the video tape deposition of Dr. Russell. In response to a question by the court, the respondents stated they had no objection to the reception of that evidence. The video tape of the deposition was played to the jury without further comment or interruption.

The objections posed by the appellants at the taking of the deposition did not preserve themselves. Cf. *Anderson v. Rojanasathit,* supra. It was the obligation of the appellants to preserve them by obtaining a ruling from the trial court before appellants presented that testimony to the jury. *Arie v. Intertherm, Inc.,* 648 S.W.2d 142 (Mo.App.1983). By failing to do so, the appellants waived those objections. See *Keller v. Anderson Motor Service, Inc.,* 652 S.W.2d 735 (Mo.App.1983). Even if, upon proper objection, the reception of that testimony would have been error, the appellants cannot complain of error they invited. *Hilton v. Crouch,* 627 S.W.2d 99 (Mo.App.1982).

The appellants' final point is "the trial court's refusal to allow Bobby Stone to testify regarding what instructions, if any, he was given, unfairly attacked his credibility and enhanced the credibility of the doctors' testimony." The appellants argue "each time Bobby Stone was asked as to the instructions received, respondents objected on the basis of hearsay." They cite six pages in the transcript to support the point. An examination of those pages reveals that on four occasions objections were sustained to questions concerning what the doctors told Stone about his diagnosis and future treatment. Two questions asked an opinion concerning whether or not Stone needed help or should continue in the dairy business. Appellants' counsel did not ask Stone what the doctors instructed him relative to his activities. That fact is emphasized by the appellants' failure to preserve the point by an offer of proof of the evidence that they now claim was improperly excluded. *Huelster v. St. Anthony's*

*Medical Center,* 755 S.W.2d 16 (Mo.App. 1988). Respondents did ask Stone about Dr. Richardson's instruction. However, the appellants successfully objected. The trial court did not, except on appellants' objection, refuse to allow Stone to testify regarding what instructions his doctors gave him. The appellants' final point has no factual basis. The point is denied.

■ The appellants filed in this court a motion for a new trial upon the basis of newly discovered evidence. The motion is supported by an affidavit stating the affiant saw the accident while seated on the front porch of his business 200 feet from the scene of the accident. The affiant gives an account of the accident that substantially differs from that given by Stone. Neither the motion nor the affidavit establishes any reason why the testimony was not discoverable long before the trial, almost two years after the accident. Within the precepts established in *City of Eureka v. Hall,* 687 S.W.2d 917 (Mo.App.1985), the motion has no substantive merit. Moreover, it is procedurally flawed and is denied. The judgment is affirmed.

PREWITT, P.J., and HOGAN, J., concur.