Judy **VAN VACTER**, Tracy Van Vacter, Jerry Van Vacter, and Chris Van Vacter, Appellants,

v.

Rebecca **HIERHOLZER**, Mary Coltharp, Spectrum, Inc., Research Medical Center, and Prime Health Management Services, Inc., Respondents.

No. WD 45909.

Missouri Court of Appeals, Western District.

June 22, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 27, 1993.

Application for Transfer Sustained Sept. 28, 1993.

Case Retransferred Dec. 21, 1993.

Court of Appeals Opinion Readopted Dec. 23, 1993.

Max Von Erdmannsdorff, Brian Klopfenstein, Kansas City, for appellants.

Hal D. Meltzer, Gabrielle M. Rhodes, Gregory N. Pottorff, Kansas City, for respondents.

Before KENNEDY, P.J., and BERREY and SPINDEN, JJ.

SPINDEN, Judge.

Judy Van Vacter and her children appeal the jury's verdict in their wrongful death action arising out of Jerry Van Vacter's death. The jury found that Rebecca Hierholzer and Mary Coltharp, the treating physicians, negligently treated Van Vacter's condition, but it assessed only one percent fault to Hierholzer and six percent fault to Coltharp. It returned a verdict of no damages. We reverse and remand for a new trial.

### I.

In January 1982, at the age of 40, Van Vacter survived a major heart attack. Physicians discovered that he was suffering severe arterial disease. Some of his arteries had narrowed 80 percent. Doctors treated him with bypass surgery and drugs, and they instructed him to quit smoking, to exercise and to lower his weight and cholesterol.

On October 12, 1983, Van Vacter went to St. Luke's Hospital in Kansas City complaining of severe chest pains. Doctors admitted him to the hospital because his electrocardiogram (EKG) was abnormal. His vessels had narrowed further. His treating physician did not believe another bypass was feasible, so he proposed balloon angioplasty and drug treatment. Van Vacter rejected angioplasty. His doctor prescribed drugs, but Van Vacter did not take them as prescribed.

Van Vacter did not return for examinations as his doctor requested. He did not see another doctor until August 1, 1986, when he went to Prime Health Management Services, Inc., a health maintenance organization, complaining of chest pains. A doctor there prescribed the same drugs as had been prescribed before. He returned on September 3, 1986, for a follow-up examination. Although a Prime Health doctor asked him to return for a third examination on September 24, 1986, he did not return, and he quit taking the prescribed drugs because they made him feel uncomfortable and he was gaining weight.

During the late evening of March 10, 1987, Van Vacter had severe chest pains. He took nitroglycerine between 11:30 P.M. and midnight. Because the drug did not relieve his pain, he asked his wife, Judy Van Vacter, to call Prime Health. Someone at Prime Health advised her to take her husband to Research Hospital.

When they arrived at 1:40 A.M., his pain had subsided. Hierholzer examined him at 1:45 A.M. and ordered an EKG. Van Vacter told her of his history of pain since his bypass operation in 1982. He said that he had not had any chest pain for the previous three to five months, and when he did have pain it abated when he took nitroglycerine. He told Hierholzer that he was no longer in pain. He also told Hierholzer that he was not taking any drugs for his heart other than nitroglycerin when he had chest pains.

Tests indicated that Van Vacter had a good heartbeat when Hierholzer called Coltharp, the on-duty physician at Prime Health. After discussing the test results, including the EKG, a cardiac enzyme test and talking to Van Vacter, Hierholzer—with Coltharp's approval—released Van Vacter because they believed his chest pain was spasmodic and had stabilized.

Hierholzer instructed Van Vacter to seek immediate medical attention if his pain recurred. She told him to go to Prime Health later in the morning for a cardiology examination. She gave him a prescription for nitroglycerine because the nitroglycerine he

had was stale, and he filled the prescription at the hospital pharmacy.

As he was returning home, Van Vacter complained to his wife that he still felt pain, but they did not return to the hospital. When they got home, Judy Van Vacter gave him one of the new nitroglycerine tablets. She talked to him for about 15 minutes and went to bed. Van Vacter went to bed a little later, but he was in so much pain he could not lie down. He went to the living room and sat on the couch. Between 4:00 and 4:40, Judy Van Vacter took a blanket to him and went back to bed. She awoke about 30 minutes later and heard him gasping for breath. She dialed 911 for emergency assistance.

An ambulance arrived at about 5:30 and took him to North Kansas City Hospital. Doctors pronounced him dead at 6:40 A.M. on March 11, 1987. Judy Van Vacter refused an autopsy.

Van Vacter's survivors sued the respondents for wrongful death. The jury apportioned 93 percent of the fault for Van Vacter's death to Van Vacter's own negligence. Van Vacter's survivors appeal.

## II.

■ The focus of this appeal is on Instruction No. 6 which stated:

In your verdict you must assess a percentage of fault to decedent Jerry Van Vacter if you believe:

First, either:

*decedent failed to follow the instructions and/or recommendations of his physicians since 1982 with respect to smoking, diet, cholesterol, exercise, medication, balloon angioplasty and/or other medical therapy, or followup, or,*[1]

decedent failed to give Dr. Hierholzer an accurate history, and

Second, decedent Jerry Van Vacter, in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, such negligence of decedent Jerry Van Vacter directly caused or directly con-

---

1. We added the emphasis.

tributed to cause the death of decedent Jerry Van Vacter.

Van Vacter's survivors argue that the instruction erroneously permitted the jury to consider acts which were not the proximate cause of Van Vacter's death.

If this instruction is an incorrect statement of the law and the error caused a substantial potential for prejudicial effect, we must reverse. *Fowler v. Park Corporation*, 673 S.W.2d 749, 756, 757 (Mo. banc 1984).

The jury heard evidence that Van Vacter's refusal to obey doctors' orders or to cooperate in the treatment of his arterial disease was irresponsible and set him on an irreversible path to his death on March 11, 1987. Hierholzer[2] argues that Van Vacter, in effect, committed suicide and, therefore, must share in the fault for his death.

Indeed, the evidence established that Van Vacter had a nonchalant attitude about his health. The issue is whether this indifference and its consequent inaction was significant as the legal proximate cause of Van Vacter's death-a prerequisite to labeling Van Vacter a joint tortfeasor who must share in Hierholzer's and Coltharp's fault. It was not.

▆ Proximate cause is the causal connection between the actor's conduct and the resulting injury. To be a proximate cause of an injury, a patient's negligent act must have been simultaneous and cooperative with the defendant's negligent act. It is "such cause as operates to produce a particular consequence without the intervention of an independent cause, in the absence of which the injuries would not have been inflicted." *Vann v. Town Topic, Inc.*, 780 S.W.2d 659, 661 (Mo.App.1989). Negligent conduct which sets in motion a series of events leading to an injury can be interrupted by an intervening cause which so interrupts the chain of events as to become the responsible, direct, proximate cause of the injury. *Id.*

▆ Determining whether conduct is the proximate cause can be "exasperating," as the Supreme Court of Missouri noted because "in deciding questions of proximate cause and efficient, intervening cause, each case must be decided on its own facts, and it is seldom that one decision controls another." *Krause v. U.S. Truck Company, Inc.*, 787 S.W.2d 708, 710 (Mo. banc 1990). One commentator has noted:

"Proximate cause"—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation."[3] As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

This limitation is to some extent associated with the nature and degree of the connection in fact between the [actor's] acts and the events [complained of]. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands, or of what is administratively possible and convenient.... The attempt to [discern this limit] leads often to confusion.

W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 264 (5th ed. 1984). Courts have been reluctant to impose joint liability upon a patient in a malpractice lawsuit for the condition which caused him to seek the physician's assistance, even if the patient negligently

---

2. Coltharp settled with the Van Vacters and is, therefore, not involved in this appeal.

3. A quotation from *North v. Johnson*, 58 Minn. 242, 59 N.W. 1012 (1894).

imposed the condition upon himself.[4]

Courts construing Missouri law have ruled: Prior and remote cause cannot be made the basis of a negligence action if the remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, and there intervened between that cause and the injury a distinct, successive, unrelated, and efficient cause of the injury, though the injury would not have occurred but for the condition or occasion.

*Phillips v. United States,* 743 F.Supp. 681, 686 (E.D.Mo.1990) (citing *Clymer v. Tennison,* 384 S.W.2d 829, 835 (Mo.App.1964)).

■ The conduct described in Paragraph First of Instruction No. 6 was not a proximate cause of Van Vacter's injury, except to the extent it described Van Vacter's failure to obey Hierholzer's and Coltharp's treatment instructions on March 10 and 11. Rather, it gave rise to his condition and the occasion for Hierholzer's and Coltharp's negligence. *Duke v. Missouri Pacific Railroad Company,* 303 S.W.2d 613 (Mo.1957). It was not a basis for the jury to apportion fault to him for any injury caused by Hierholzer's and Coltharp's negligence.

Hierholzer relies heavily on *Gray v. Brock,* 750 S.W.2d 696 (Mo.App.1988), in which this court held that a jury could consider a decedent's actions before a physician's alleged negligence in attributing fault to the decedent. Unlike Van Vacter's case, the patient in *Gray* was accused of refusing medical treatment only two days before the doctor's alleged negligence although the patient knew his diabetic condition was "out of control." Van Vacter failed to promote his own health, but when his symptoms became manifest on March 10, he acted immediately to seek medical treatment.

### III.

Van Vacter's survivors also make a valid complaint concerning the jury's determination that they suffered no damages for past

economic damages arising from Van Vacter's death. Although the jury heard uncontradicted evidence of funeral expenses—a cost specifically authorized by § 537.090, RSMo 1986—it found no damages.

The trial court instructed the jury, consistent with § 537.090, RSMo 1986, and MAI 6.01 [1965 New], that the jury could mitigate the damages. Section 537.090, however, provides that the jury may consider "[t]he mitigating ... circumstances *attending* the death."[5]

The Supreme Court of Missouri has admonished that although the jury has "broad discretion" in reducing actual damages because of mitigating circumstances, the reduction must be supported by evidence. *Hagen v. Celotex Corporation,* 816 S.W.2d 667, 674 (Mo. banc 1991). As this court stated in *Guthrie v. Missouri Methodist Hospital,* 706 S.W.2d 938, 942 (Mo.App.1986), for conduct to be deemed within the circumstances attending death, it must be "causally connected to the decedent's death[.]"

The jury heard evidence from which it could have concluded that the damages arising out of Van Vacter's funeral should be mitigated down to zero. It heard that Van Vacter refused to call Hierholzer even in the face of pain so severe that he could not lie down although Hierholzer had admonished him to call her if he suffered any further angina. It was only after his wife heard him gasping for breath that the Van Vacters sought additional medical intervention. It heard controverted evidence that Van Vacter did not give Hierholzer a complete and accurate medical history.

■ However, mixed in with this evidence was evidence of Van Vacter's nonchalant attitude toward his physician's treatment of his arterial disease since 1982, discussed above concerning Instruction No. 6. Although this evidence may be pertinent for other issues, such as the value of Van Vacter's life and to test Van Vacter's accuracy in giving his med-

**4.** See *Owens v. Stokoe,* 140 Ill.App.3d 355, 92 Ill.Dec. 726, 485 N.E.2d 537 (1985); *Lamoree v. Binghamton Gen. Hosp.,* 68 Misc.2d 1051, 329 N.Y.S.2d 85 (S.Ct.1972); *Matthews v. Williford,* 318 So.2d 480 (Fla.App.1975); *Whitehead v. Lin-* kous, 404 So.2d 377 (Fla.App.1981); *Cheek v. Domingo,* 628 F.Supp. 149 (D.V.I.1986).

**5.** We added the emphasis.

ical history to Hierholzer, it was not pertinent to the circumstances attending his death. Because Van Vacter's actions before March 10 and 11 were not a proximate cause of his death, it was not proper for the jury to have considered them in mitigating past economic damages.

The respondents do not challenge the validity of the Van Vacters' complaint that the jury's finding of no damages in connection with ambulance and funeral expenses was error, except to assert that it was not preserved for appeal. They argue, instead, that the verdict was inconsistent and the Van Vacters waived the issue by not objecting when the jury announced its verdict. We need not pass judgment on the contention because we find a substantial potential for prejudice in that the jury may have considered evidence which was not "attending" Jerry Van Vacter's death.

### IV.

We find that Instruction No. 6 was erroneous because it invited the jury to apportion fault to Van Vacter for his death on the basis of evidence which was not a proximate cause of his death. Moreover, the jury's verdict for no damages notwithstanding uncontroverted evidence that Van Vacter's survivors incurred ambulance and funeral expenses was prejudicial error, and the trial court erred in not granting the survivors' motion for a new trial. We reverse and remand for a new trial.

All concur.