

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| DAVID AND CRYSTAL HOLM, | ) | |
| | ) | |
| Respondents, | ) | WD78666 |
| | ) | |
| v. | ) | OPINION FILED: April 19, 2016 |
| | ) | |
| WELLS FARGO HOME MORTGAGE | ) | |
| INC. AND FEDERAL HOME LOAN | ) | |
| MORTGAGE CORPORATION | ) | |
| (FREDDIE MAC), | ) | |
| | ) | |
| Appellants. | ) | |

**Appeal from the Circuit Court of Clinton County, Missouri**
The Honorable Richard B. Elliott, Judge

Before Division One: Lisa White Hardwick, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

Wells Fargo Home Mortgage, Inc. ("Wells Fargo") and Federal Home Loan

Mortgage Corporation ("Freddie Mac") appeal from a judgment entered in a court tried

case in favor of Crystal G. Holm ("Crystal") and David Holm ("David")[1] (collectively the

"Holms"). The judgment awarded compensatory and punitive damages in favor of the

---

[1]We refer to the Holms individually by their first names to avoid confusion. No undue familiarity or disrespect is intended.

Holms and against Wells Fargo for wrongful foreclosure. The judgment also quieted title in the foreclosed real estate in favor of the Holms as against the interests of Freddie Mac.

We affirm in part and reverse in part.

**Factual and Procedural Summary[2]**

The Holms were the owners of real property at 3800 Timberlake Drive ("Property") in Clinton County, Missouri. They executed a deed of trust ("Deed of Trust") on the Property on July 30, 2001, to secure a promissory note ("Note"). The Note and Deed of Trust identified the lender/mortgagee as Commercial Federal Mortgage Corp.

At a point in time not clearly identified in the record, Freddie Mac acquired the Note, Wells Fargo began servicing the Note for Freddie Mac, and the Holms began making their mortgage payments to Wells Fargo. In early May 2008, the property suffered significant storm damage. An insurance check in the amount of $4,467.74 was issued to cover the damages, payable jointly to the Holms and to Wells Fargo. The Holms sent the check to Wells Fargo for its endorsement so that the proceeds could be returned to the Holms to be used to repair the Property. Wells Fargo refused to return the check.

By letter dated June 4, 2008, the law firm of Kozeny & McCubbin, L.C. ("Kozeny") notified the Holms that their Note had been accelerated and that the amount required to be paid to reinstate the Note was $6,608.93, of which $5,534.62 represented

---

[2]We view conflicting evidence in the light most favorable to the judgment. *Blanchette v. Blanchette*, 476 S.W.3d 273, 278 n.1 (Mo. banc 2015).

2

unpaid payments, and the balance represented various itemized charges or fees. The Holms sent a handwritten letter dated June 9, 2009, to Kozeny disputing the validity of the debt. They complained that a representative of Wells Fargo had falsely reported that the Holms were evacuating the Property, having witnessed the Holms cleaning out a storm damaged barn. Though, as the letter explained, another Wells Fargo representative had since verified that the Holms were not evacuating the Property, the Note had nonetheless been accelerated based on the false information, and the insurance proceeds check was thus being improperly held by Wells Fargo. The Holms explained in the letter to Kozeny that although they had been behind a few months on their Note payments, they had a payment plan in place with Wells Fargo before the storm damage occurred and that Wells Fargo had since agreed to apply the insurance proceeds check to the Note. As a result, according to the Holms, they were not in default, and the "fees" itemized in the June 8, 2008 letter were not owed.

Kozeny responded with a letter dated June 18, 2008 providing a payoff amount for the entire loan.

Frustrated, the Holms wrote a second letter to Kozeny dated June 24, 2008. They again disputed the debt and asked that the insurance proceeds check be returned to them so that it could be endorsed and sent back to Wells Fargo to be applied to the Note balance.

By letter dated June 26, 2008, Kozeny again wrote to the Holms "in response to your correspondence disputing the validity of the debt . . . ." The letter enclosed a copy of the Deed of Trust and a copy of the Note and stated that the enclosed "documents

3

verify the debt which is owed . . . ." The Note was not endorsed. As such, neither the letter, nor its enclosures, identified Wells Fargo or Freddie Mac, or explained how a debt was owed to either.

On July 17, 2008, Wells Fargo recorded an appointment naming Kozeny as the successor trustee of the Deed of Trust. The appointment referenced the Deed of Trust granted by the Holms to Commercial Federal Mortgage Corp. The appointment asserted that Wells Fargo was now the "owner and holder of the [N]ote described and secured by the Deed of Trust . . . ."

Foreclosure of the Property was scheduled at noon on August 15, 2008. David called Kozeny and Wells Fargo repeatedly to discuss options to resolve the dispute over the debt. On August 14, 2008, at approximately 7:00 p.m., David was finally able to speak with someone at Wells Fargo who had authority to reach an agreement. That person offered David a reinstatement amount of $10,306.94 and said that if he agreed to pay that amount, the foreclosure sale would be postponed. David agreed to the reinstatement terms. He was advised by Wells Fargo to contact Kozeny the next morning to confirm the reinstatement amount and to make arrangements to deliver payment. David was not told that payment had to be received before the foreclosure sale scheduled at noon the following day.

David called Kozeny at approximately 10:00 a.m. on August 15, 2008. Kozeny confirmed the $10,306.94 reinstatement amount and told David that someone would call him back later that afternoon with directions for delivery of a cashier's check. Kozeny told David that the foreclosure sale would be postponed.

4

Immediately after the 10:00 a.m. phone call, David went to his local physician for treatment of stress, anxiety attacks, and panic attacks. He was directed to go to the hospital where a heart monitor was attached to his chest. Between his medical visits that morning, David arranged with his mother to secure a cashier's check in the amount of $10,306.94. With a cashier's check in his possession, David awaited the telephone call from Kozeny.

Kozeny called David at around 1:00 or 2:00 p.m. and instructed him to overnight the cashier's check to its St. Louis, Missouri, office and to send a copy of the check by facsimile. David did as instructed, sending a copy of the cashier's check to Kozeny by facsimile at 4:31 p.m. on August 15, 2008, and arranging for overnight delivery of the actual check to Kozeny by Federal Express.

Unbeknownst to the Holms, the foreclosure sale of the Property had proceeded as scheduled. Freddie Mac was the purchaser at sale. Kozeny executed and recorded a successor trustee's deed dated August 19, 2008, naming Freddie Mac as the grantee of the Property.

On August 18, 2008, David contacted Wells Fargo to make arrangements for paying future Note payments. He was told that Wells Fargo did not yet have the information he needed. A few days later, the Holms received a letter from Kozeny returning the $10,306.94 cashier's check. The letter stated that the check was being returned because it had been received after the foreclosure sale. The Holms were surprised and frustrated. David had not been told that the cashier's check had to be received before noon on August 15, 2008, in order to postpone the foreclosure sale.

5

The Holms received another letter from Kozeny dated August 22, 2008. This letter stated that the $10,306.94 cashier's check had been returned because the funds were not "enough and/or not certified."

The Holms retained counsel and were offered another reinstatement amount of $8,162.24. Once again, David made arrangements with his mother to secure a cashier's check in the agreed amount. The check was sent to Wells Fargo. Wells Fargo did not cash the check or reinstate the loan and retained the check for approximately one year before it was returned.

On November 26, 2008, the Holms filed a lawsuit against Wells Fargo and Freddie Mac. Count I asserted a claim for wrongful foreclosure against Wells Fargo only and sought compensatory and punitive damages. Count I alleged that Wells Fargo was the "trustee and beneficiary/mortgagee under a deed of trust purchased by Commercial Federal Bank executed by" the Holms and that said "deed of trust [was] secured by a note payable by [the Holms] to . . . Wells Fargo." The petition also identified Freddie Mac as the entity whose pre-foreclosure regulations were required to be followed. Count 1 alleged that the Property was wrongfully foreclosed because the Note had been falsely accelerated based on a mistaken belief that the Holms were abandoning the Property; because on August 15, 2008, there was no breach of condition or failure to perform by the Holms which would authorize foreclosure; and because Wells Fargo "failed to accept reinstatement funds of $10,306.94 tendered by [the Holms] at [Wells Fargo's] request . . . ." The petition did not allege that the foreclosure was wrongful because the Note was not endorsed, preventing its enforcement by either Wells Fargo or Freddie Mac. Count I

6

of the petition alleged that as a result of the wrongful foreclosure, the Holms were deprived of the Property and of any equity and alleged that Wells Fargo acted maliciously and outrageously. Count I sought a judgment against Wells Fargo for compensatory damages in a "fair and reasonable [sum], together with punitive damages."

Counts II and III of the petition were asserted solely against Freddie Mac and respectively sought judgments quieting title and setting aside the successor trustee's deed. Both Counts incorporated all other allegations in the petition and alleged a right to the requested relief because the Property had been wrongfully foreclosed.

The parties had several discovery disputes. The details of those disputes will be addressed as necessary later in this Opinion. In a pretrial order entered on January 12, 2015, the trial court summarized the discovery issues it had encountered and concluded that Wells Fargo, Freddie Mac, and Kozeny (who was acting as counsel for both) "have demonstrated a pattern of contempt for the Missouri Supreme Court Rules, as well as this Court's rules and Orders." As a result of the disputes, the trial court imposed the following discovery sanctions: (1) Wells Fargo's and Freddie Mac's pleadings were stricken; (2) Wells Fargo and Freddie Mac were prohibited: from offering any evidence at trial, from cross-examining the Holms' witnesses, and from objecting to the admission of evidence[3] offered by the Holms with respect to liability and damages; and (3) Wells

---

[3]The trial court did not prohibit all objections and advised that objections would be addressed one by one at trial. As a result, procedural objections were not included within the scope of the discovery sanctions. Rather, the trial court's intent appears to have been limited to prohibiting routine objections to the admission of evidence at trial. Wells Fargo and Freddie Mac have not complained on appeal that the discovery sanction was ambiguous in this regard to their prejudice. And our review of the record indicates it was not, as Wells Fargo and Freddie Mac freely objected at trial.

Fargo and Freddie Mac were ordered to pay attorney's fees and costs in an amount to be determined.

At trial, the Holms read the deposition of Freddie Mac's corporate representative, Dean Meyer ("Meyer"), into evidence. Meyer testified that Freddie Mac, not Wells Fargo, was the owner of the Note, and that Wells Fargo was the loan servicer pursuant to a loan servicing agreement. Meyer acknowledged that the copy of the Note sent to the Holms with Kozeny's June 26, 2008 letter was not endorsed, which prevented that copy of the Note from being enforced by anyone other than Commercial Federal Mortgage Corp., the lender identified in the Note. In other words, Meyer acknowledged that the documents sent with the June 26, 2008 letter did not verify that a debt was owed by the Holms to either Wells Fargo or Freddie Mac. Meyer testified that the loan servicing agreement with Wells Fargo encouraged loan servicers to work with borrowers to reinstate loans. Meyers verified that Freddie Mac did not contemporaneously know about the reinstatement agreement Wells Fargo reached with the Holms but would have had no issue with the agreement. Meyers also testified that had Freddie Mac been asked, it would have agreed to reinstate the loan on the same terms immediately after the foreclosure sale.

At trial, the deposition of Wells Fargo's corporate representative, Amber Ott ("Ott"), was read into evidence. Ott verified that David had been told on August 14, 2008, that the loan could be reinstated by payment of $10,306.94, that a facsimile copy of a cashier's check in that amount was received by Kozeny on August 15, 2008, and that the actual cashier's check was received by Kozeny on August 16, 2008. Contrary to

8

Kozeny's August 22, 2008 letter to the Holms, Ott testified that the Holms' cashier's check was a "certified" check in the agreed amount. Ott claimed, however, that the check was returned to the Holms because David had been told that payment needed to be received before the scheduled foreclosure sale in order to postpone the sale.

David testified and explained why the Note was not in default at the time it was accelerated. David recounted all of his efforts to communicate with Wells Fargo and Kozeny, culminating with the agreement to reinstate the Note reached with Wells Fargo late on August 14, 2008. David explained how the disputes with Wells Fargo had caused him severe emotional distress and related physical stress, requiring medical attention. He testified that although the Property sold at foreclosure for $141,762.30, it was only worth $52,000 at the time of trial. And he testified that he had undertaken post-foreclosure repairs to the Property valued at $6,150, which included the cost of materials and a value assigned to his labor.[4] Crystal testified about the effect of the disputes with Wells Fargo on her emotional health and well-being and on that of her husband.

The Holms called an expert witness to testify about the practices and procedures in the mortgage industry, and to explain why Wells Fargo would have been financially incentivized to proceed with foreclosure notwithstanding the reinstatement agreement reached with the Holms on August 14, 2008.

During the trial, Wells Fargo and Freddie Mac registered numerous objections to the proceedings. The trial court repeated its sanction prohibiting objections to the

---

[4]The Holms remained in possession of the Property after it was foreclosed. They have been named as defendants in two unlawful detainer actions initiated by Freddie Mac, both of which have been dismissed, the last one with prejudice.

admission of evidence but entertained (and denied) several procedural objections. Those objections included that: (i) Wells Fargo had not waived the right to a jury trial on Count I of the petition, an action at law seeking damages; (ii) emotional distress damages were not pled in the petition as special damages and could not be awarded; (iii) wrongful foreclosure based on a theory that the Note was not endorsed and could not be enforced by Wells Fargo or Freddie Mac was not pled in the petition; and (iv) the Holms could not recover both compensatory and punitive damages for wrongful foreclosure, while also recovering title to the Property, and were required to elect between these inconsistent remedies. In response to the latter objection, the Holms dismissed Count III of the petition seeking to set aside the successor trustee's deed. However, the Holms did not agree to dismiss Count II of the petition seeking to quiet title.

The trial court entered its judgment on January 26, 2015 ("Judgment"). The Judgment found in favor of the Holms and against Wells Fargo on Count I of the petition and awarded compensatory damages in the amount of $89,762.30 for the post-foreclosure loss in value of the Property; in the amount of $6,150 for the value of post-foreclosure repairs to the Property; and in the amount of $200,000 for emotional distress. The Judgment awarded the Holms punitive damages against Wells Fargo in the amount of $2,959,123. The Judgment found in favor of the Holms and against Freddie Mac on Count II of the petition and quieted title to the Property in the Holms.

Wells Fargo and Freddie Mac timely appealed after post-trial motions were denied.

10

## Analysis

Wells Fargo and Freddie Mac raise eight points on appeal. We address them in order.

## Point One

In the first point on appeal, Wells Fargo claims that the trial court erred in entering judgment in favor of the Holms on Count I for wrongful foreclosure because the Holms failed to carry their burden of proof because the evidence established that: (i) the Holms were in default; (ii) there was no enforceable agreement to reinstate the loan after it was accelerated; and (iii) Wells Fargo was the holder of the Note and Deed of Trust when the foreclosure occurred.

The applicable standard of review for appeals of court-tried civil cases is detailed in *White v. Director of Revenue*, 321 S.W.3d 298, 307-08 (Mo. banc 2010). The judgment of the trial court will be affirmed "'unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.'" *Id*. (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). Here, no party requested findings of fact and conclusions of law as permitted by Rule 73.01(c). We therefore presume that all factual issues were resolved in accordance with the result reached and will affirm the trial court on any basis supported by the record. *Hervey v. Director of Revenue*, 371 S.W.3d 824, 828 (Mo. App. W.D. 2012).

Wells Fargo claims that the Holms' wrongful foreclosure claim rested on three theories and that the Holms failed to meet their burden of proof as to any of the theories.

11

The first theory, according to Wells Fargo, was that the Holms were not in default when the Note was accelerated. Where a claim of wrongful foreclosure urges that there was no right to foreclose because no default giving rise to a right to sell exists, the party seeking damages "must plead and prove that *when the foreclosure proceeding was begun*, there was no default on its part that would give rise to a right to foreclose." *Dobson v. Mortgage Elec. Registration Sys., Inc./GMAC Mortgage Corp.*, 259 S.W.3d 19, 22 (Mo. App. E.D. 2008) (emphasis added).

Here, the Holms pled that they were not in default at the time foreclosure proceedings commenced. They pled that the Note had been falsely accelerated at a time when they were making payments per a payment arrangement and, based on a false report that they were evacuating the Property, when in fact they were only cleaning out a storm damaged barn. The Holms' evidence at trial was consistent with this allegation and satisfied the Holms' burden of proof.

Wells Fargo's Brief emphasizes evidence from which it could be inferred that the Holms were behind on monthly payments when the Note was accelerated. In doing so, Wells Fargo ignores contrary evidence from which the trial court could have inferred that a payment plan regarding those payments had been reached and was being performed by the Holms when the Note was accelerated. The Holms wrote to Kozeny twice explaining that they had a payment plan in place with respect to the unpaid payments. The Holms also attempted to explain to Kozeny that the Note had been accelerated not for nonpayment, but because a Wells Fargo representative had falsely represented that the

Holms were evacuating the Property. The Holms consistently disputed that they were in default. The trial court was free to believe this evidence.

The second theory, according to Wells Fargo, was that the Holms were not in default when the Property was sold at foreclosure because a reinstatement agreement had been reached with Wells Fargo.[5] Because we have already concluded that the trial court's judgment on Count I of the petition is supported by substantial evidence that there was no default at the time foreclosure proceedings were commenced, we technically need not address this second theory. *Hervey*, 371 S.W.3d at 828 (holding that we are to affirm the trial court on any basis supported by the record). However, because it is plain from the Judgment that this second theory was heavily relied on by the trial court to award punitive damages, we address whether the Holms met their burden of proof to establish that they had reached an enforceable agreement to reinstate the Note at the time the Property was sold.

The Holms claim that the night before the scheduled foreclosure, Wells Fargo agreed to postpone the foreclosure sale based on the Holms' promise to pay $10,306.94 to reinstate the Note. There was substantial evidence to support this assertion, given David's testimony, and given that Ott admitted that Wells Fargo reached an agreement with David on August 14, 2008, to reinstate the Note and to postpone the foreclosure sale in exchange for payment of $10,306.94. Although Ott claimed the agreement required

---

[5]Ordinarily, a mortgagor's contention that a reinstatement agreement was reached with a mortgagee would suggest a concession by the mortgagor that the loan requiring reinstatement was in default. Here, however, the Holms' assertions that they were not in default, and had reached a reinstatement agreement, are not in tension. On this record, the trial court could readily have concluded that the Holms felt they had no choice but to reach a reinstatement agreement with Wells Fargo in order to avoid foreclosure of the Property, even though they contended that the Note had been wrongly accelerated.

the Holms to deliver payment in advance of the scheduled sale, David testified he was never told he had to ensure delivery of payment before the scheduled sale. The trial court was free to resolve this conflicting evidence by believing David's testimony. The circumstances surrounding the agreement suggest that would have been a reasonable inference. The agreement was not reached until late on August 14, 2008. Wells Fargo told David to contact Kozeny the next morning to confirm the reinstatement amount and to arrange for delivery of payment. Kozeny's offices were in St. Louis, making delivery of payment by noon on that same day a difficult proposition. David contacted Kozeny at around 10:00 a.m. on August 15, 2008, at which time Kozeny confirmed the payment amount and that the foreclosure would be postponed and told David to secure a cashier's check and to await a call with specific payment delivery instructions. And Kozeny called David at around 1:00 or 2:00 p.m. on August 15, 2008, (after the time scheduled for the foreclosure sale) with payment delivery instructions. This evidence suggests that the reinstatement agreement did not require the delivery of payment before the scheduled foreclosure sale. The Holms satisfied their burden to establish that there was a reinstatement agreement with Wells Fargo in place prior to the scheduled foreclosure sale and that, as a result, they were not in default at the time of the foreclosure sale.

Wells Fargo nonetheless challenges whether the reinstatement agreement was legally enforceable. The argument portion of the Brief claims that even if a reinstatement agreement was reached, it was not enforceable because it violated the Deed of Trust's prohibition against oral modifications. This assertion is in the nature of an affirmative defense as to which Wells Fargo, not the Holms, would have born the burden of proof.

14

*Warren v. Paragon Technologies Group, Inc*., 950 S.W.2d 844, 846 (Mo. banc 1997). The affirmative defense was not asserted in Wells Fargo's answer to the petition, and even had it been, Wells Fargo's pleadings were stricken, rendering affirmative defenses (whether or not properly pled) irrelevant to the resolution of this case. Moreover, Meyer, Freddie Mac's representative, testified that oral reinstatement agreements to forestall foreclosures are permitted by the terms of the loan servicing agreement with Wells Fargo.

There was substantial evidence from which the trial court could have concluded that the Note was not in default when the Property was sold at foreclosure because an enforceable reinstatement agreement had been reached between Wells Fargo and the Holms.[6]

The third wrongful foreclosure theory relied on by the Holms, according to Wells Fargo, was that Wells Fargo was not the holder of the Note and Deed of Trust and had no power to foreclose the Property because the Note was not endorsed. We need not address whether the evidence supported this theory because we have already concluded that the trial court's judgment on Count I of the petition is supported by substantial evidence that

---

[6]Wells Fargo's point on appeal does not challenge whether a mortgagee's failure to honor an agreement to postpone a scheduled foreclosure can support a claim in tort to recover damages at law for wrongful foreclosure (as distinguished from a claim in equity to set aside the foreclosure). We thus do not address the issue but assume for purposes of this Opinion that such a claim is cognizable. *Compare Dobson*, 259 S.W.3d at 22 (holding that "[a] tort action for damages for wrongful foreclosure lies against a mortgagee only when the mortgagee had no right to foreclose ***at the time foreclosure proceedings were commenced***") with *Peterson v. Kansas City Life Ins. Co.*, 98 S.W.2d 770, 773 (Mo. 1936) (addressing "true cases of wrongful foreclosure by the mortgagee," including the case of *Missouri Real Estate Syndicate v. Sims*, 78 S.W. 1006 (Mo. 1904), where the "***mortgagee had no right to foreclose because he had made a valid extension agreement***")." (Emphasis added.) *And see Spires v. Lawless*, 493 S.W.2d 65, 71 (Mo. App. Spring. Dist. 1973) which holds:

> Recovery for wrongful foreclosure has been allowed in such widely varying circumstances that it is doubtful that any single theory of recovery is applicable to every case which has been called an "action for wrongful foreclosure." The best that can be said is that the authorities cannot be fully reconciled, and an examination of the topically collated cases to discover the true basis of legal liability in such actions obscures as much as it clarifies.

15

there was no default at the time foreclosure proceedings were commenced or at the time the foreclosure sale proceeded. *Hervey*, 371 S.W.3d at 828 (holding that we are to affirm the trial court on any basis supported by the record). We are particularly inclined in this direction because the Holms did not plead wrongful foreclosure in their petition based on a theory that neither Wells Fargo nor Freddie Mac was the holder of the Note. Rather, the petition alleges that Wells Fargo was the trustee and beneficiary/mortgagee under the Deed of Trust, which was secured by the Note "payable . . . to . . . Wells Fargo." Though evidence was admitted at trial establishing that the copy of Note attached to Kozeny's June 28, 2008 letter was not endorsed, it was admitted over Wells Fargo's and Freddie Mac's objection that the evidence exceeded the scope of the petition. We need not address whether that objection should have been sustained, as Judgment on Count I of the petition is otherwise supported by the evidence.

Point one on appeal is denied.

## Point Two

In the second point on appeal, Freddie Mac claims that the trial court erred in entering judgment in favor of the Holms on Count II of the petition quieting title in favor of the Holms. Freddie Mac claims that because the Holms elected to recover monetary damages for wrongful foreclosure, they could not also seek the inconsistent remedy of restoration of title to the Property.[7]

---

[7]During a January 12, 2015, pretrial conference, the trial court made it clear that it would entertain an objection requiring the Holms to elect between inconsistent remedies at the close of the plaintiffs' evidence at trial, notwithstanding the imposition of discovery sanctions barring objections to the Holms' evidence.

The applicable standard of review is the same as is described in our discussion of point one on appeal. We will affirm the trial court's judgment "'unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.'" *White*, 321 S.W.3d at 307-08 (citing *Murphy*, 536 S.W.2d at 32).

When a foreclosure is wrongful, "the mortgagor has two remedies: it can let the sale stand and sue at law for damages or it can bring an equitable action to have it set aside." *Dobson*, 259 S.W.3d at 22. The Holms acknowledged this legal principle when, at the close of the evidence, they dismissed Count III of their petition seeking to set aside the successor trustee's deed, electing instead to proceed with an action at law for damages.

The Holms nonetheless insisted on proceeding to judgment on Count II of the petition seeking to quiet title. They argued that a quiet title action is different from an action to set aside a trustee's deed. In the context of a wrongful foreclosure action, we disagree.

Counts II and III of the petition were asserted against Freddie Mac, the owner of the Note, and the purchaser of the Property at the foreclosure sale. Count II alleged that Freddie Mac has no right to title, ownership, or possession of the Property "because the foreclosure was unlawful." Count III alleged that "[b]ecause the foreclosure was unlawful," there was no authority to issue a successor trustee's deed to Freddie Mac. Both Counts incorporated all other allegations in the petition by reference. The other allegations in the petition asserted that foreclosure was wrongful foreclosure because: (i)

17

the Holms were not in default at the time the Note was accelerated; and (ii) Wells Fargo wrongfully failed to postpone the foreclosure sale after reaching an agreement to reinstate the Note.

Counts II and III of the petition are not legally distinguishable. Neither is the relief sought in the Counts. Demonstrative of this point, the prayer for relief in Count III sought "to set aside the [successor trustee's deed], quiet title to the [Property] in favor of [the Holms], and for such other relief the Court deems just and fair." Stated simply, in both Counts II and III of the petition, the Holms sought to divest Freddie Mac of title and sought to have title to the Property restored to them. Thus, in electing the remedy to pursue an action at law for damages and to dismiss Count III, the Holms were necessarily electing to abandon the legally indistinguishable claim to quiet title under Count II.

The Holms argue that Count II is distinguishable from Count III because quiet title is a statutory cause of action pursuant to section 527.150, which only requires proof that the Holms possessed title superior to that of Freddie Mac. However creative the argument, it distills to this simple point. The Holms' title is superior to that of Freddie Mac's if and only if the recorded successor trustee's deed conveying title to the Property to Freddie Mac is disregarded. And to disregard the successor trustee's deed, the evidence must establish that the foreclosure was wrongful and void. Whether framed as an action in equity to set aside the successor trustee's deed, or as a statutory quiet title action, the relief requested by the Holms is the same and depends for its proof on the same evidence.

18

The Holms were not entitled to recover damages at law for wrongful foreclosure while also recovering title to the Property in equity. *Dobson*, 259 S.W.3d at 22. "An action of tort, and a proceeding to set aside the foreclosure, are alternative and inconsistent remedies." *Peterson*, 98 S.W.2d at 774 (internal quotation omitted).

Undeterred, the Holms contend that the recovery of damages from Wells Fargo is not inconsistent with the recovery of title to the Property from Freddie Mac. The Holms reason that the quiet title Count was asserted against a different defendant and depended on a different theory of wrongful foreclosure from that relied on to recover damages at law under Count I, as the quiet title action relied on the fact that the Note was not endorsed and could not be enforced by Wells Fargo or Freddie Mac, while Count I relied on the fact that the Note was not in default at the time foreclosure was commenced or at the time the foreclosure sale was conducted. We have already explained, however, that the Holms' petition did not assert that foreclosure of the Property was wrongful because neither Wells Fargo nor Freddie Mac was the holder of the Note. And we have explained that Wells Fargo and Freddie Mac consistently objected that evidence on this issue impermissibly exceeded the scope of the petition. The discovery sanction imposed did not afford the Holms *carte blanche* to offer evidence on theories of liability or damage that exceeded the scope of their petition.

Even assuming that the evidence at trial permissibly modified the theory of wrongful foreclosure relied on to quiet title, it cannot be ignored that the result was to render the proof required to establish Count II inconsistent with the proof required to establish Count I as pled. The quiet title action as modified by the evidence required

19

proof that neither Wells Fargo nor Freddie Mac had the authority to enforce the Note because neither were holders of the Note, while the wrongful foreclosure action seeking damages required proof that Wells Fargo had the authority to reinstate the Note because either Wells Fargo or Freddie Mac was the holder of the Note. "If two counts are so inconsistent that proof of one necessarily negates, repudiates, and disproves the other, it is error to submit them together." *Trimble v. Pracna*, 167 S.W.3d 706, 711 (Mo. banc 2005) (citing *Whittom v. Alexander-Richardson Partnership*, 851 S.W.2d 504, 507 (Mo. banc 1993)).

The Holms' reliance on *Williams v. Kimes*, 996 S.W.2d 43 (Mo. banc 1999) is unavailing. In *Kimes*, the Supreme Court observed that "numerous circumstances . . . may render a foreclosure sale void," including "where the foreclosing party does not hold title to the secured note." *Id*. at 45. While that is true, the ***reason*** a foreclosure sale is void must be distinguished from the ***remedy*** available for wrongful foreclosure. Evidence that Wells Fargo and Freddie Mac did not hold the Note would indeed be a reason for declaring the foreclosure of the Property void, just as would evidence that the Note was not in default. *Id*. (holding that "no default by the mortgagor" is another circumstance that "may render a foreclosure sale void"). Regardless why a foreclosure is wrongful, however, "the mortgagor has two ***remedies***: it can let the sale stand and sue at law for damages ***or*** it can bring an equitable action to have it set aside." *Dobson*, 259 S.W.3d at 22 (emphasis added).

As we have explained, at the close of the evidence, the Holms dismissed Count III of the petition and elected to "let the sale stand and sue at law for damages . . . ."

20

*Dobson*, 259 S.W.3d at 22. That election was equally binding on the Holms as to Count II of the petition. The entry of judgment against Freddie Mac on Count II of the petition quieting title in the Property in favor of the Holms is legally erroneous and is reversed.[8]

Point two is granted.

## Point Three

In the third point on appeal, Wells Fargo argues that the trial court erred in awarding actual damages of $295,912.30 because: (i) the Holms did not introduce evidence to establish the proper measure of damages at law in a wrongful foreclosure action; (ii) the damages the Holms were awarded were unpled special damages; (iii) the Holms did not present the required evidence of medically diagnosable and significant emotional distress; and (iv) the Holms did not present evidence that any of the damages were caused by wrongful foreclosure of the Property.

This point relied on is impermissibly multifarious. Rule 84.04(d). The point raises four distinct claims of error. Rule 84.04(d)(1)(A) requires discrete complaints of error to be asserted in separate points on appeal. The failure to abide by this Rule preserves nothing for appellate review. *Host v. BNSF Railway Company*, 460 S.W.3d 87, 96 n.4 (Mo. App. W.D. 2015). However, it is our policy where reasonably possible to "decide a case on its merits rather than on technical deficiencies in the brief." *J.A.D. v. F.J.D.*, 978 S.W.2d 336, 338 (Mo. banc 1998).

---

[8]During oral argument, the Holms' counsel confirmed that should this court disagree with the Holms' position with respect to the election of remedies, they would indeed desire to retain their judgment at law for damages for wrongful foreclosure against Wells Fargo in lieu of their judgment in equity to quiet title against Freddie Mac.

21

The standard of review applicable to each of the components of this point relied on is the same as that described in point one on appeal.

By seeking to recover damages at law for the tort of wrongful foreclosure, the Holms necessarily elected to accept the result of the foreclosure sale. In such a case, the measure of damages is the value of the equity in the property the mortgagor is deprived of by virtue of the wrongful foreclosure. *Missouri Real Estate Syndicate v. Sims*, 98 S.W. 783, 786 (Mo. App. St. L. Dist. 1906) (holding in wrongful foreclosure case where mortgagor claimed mortgagee breached agreement to extend time for payment that by pursuing action at law to recover damages, "the measure of . . . damages is the value of the equity in the property"); *see also Edwards v. Smith*, 322 S.W.2d 770, 777 (Mo. 1959) (holding that measure of damages in wrongful foreclosure action where mortgagor claims mortgagee did not have the right to foreclose because it had waived right to insist on prompt payment was "the difference between the reasonable market value of the property and the aggregate amount of the liens thereon at the date of the foreclosure sale").

Though the Holms pled a loss of their equity in the Property as damages in Count I of the petition, the Holms did not introduce any evidence suggesting that they lost equity as a result of wrongful foreclosure of the Property. Instead, the Holms claim that the Property declined in value after the foreclosure and that they are entitled to recover that lost value, measured by the difference between the price paid for the Property at foreclosure ($141,762.30) and the value of the Property at the time of trial according to David's testimony ($52,000).

22

Accepting *arguendo* that these values at the referenced temporal points are accurate, and that the loss in value was caused by the foreclosure,[9] the difference was not damage sustained by the Holms. Having elected to accept the result of the sale and to sue at law for damages, the Holms have not been injured by the Property's decline in value since the foreclosure sale. The award of $89,762.30 to the Holms for the Property's post-foreclosure loss in value is legally erroneous.

In contrast, the amount awarded to the Holms for the value of post-foreclosure repairs made to the Property is not susceptible to the same error. The recovery of this sum is not inconsistent with an election to accept the outcome of the wrongful foreclosure sale in order to recover damages at law. However, the value of post-foreclosure repairs to the Property is not damage proximately caused by wrongful foreclosure of the Property. "Proximate cause is the casual connection between the actor's conduct and the resulting injury." *Van Acter v. Hierholzer*, 865 S.W.2d 355, 358 (Mo. App. W.D. 1993). Wells Fargo's wrongful foreclosure of the Property did not cause the Holms to expend labor or funds to repair the Property, proximately or otherwise. If the value of such work to the property was recoverable from anyone, it would have been recoverable from Freddie Mac, the purchaser of the Property at the foreclosure sale, and the entity who stood to gain from the repairs. The Holms did not seek the recovery of damages from Freddie Mac, and the Judgment did not award the Holms damages against Freddie Mac.

---

[9]David testified at trial that the loss in value of the Property was attributable to the foreclosure, the lack of post-foreclosure maintenance, and the Property's location.

23

The award of $6,150 to the Holms for the value of post-foreclosure repairs to the Property was legally erroneous.

The Holms were also awarded $200,000 in damages for emotional distress. "[A] plaintiff will be permitted to recover for emotional distress provided: (1) the defendant should have realized that his conduct involved an unreasonable risk of causing the distress; and (2) the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant." *Bass v. Nooney Co.*, 646 S.W.2d 765, 772-73 (Mo. banc 1983). Wells Fargo does not challenge the sufficiency of the Holms' evidence to sustain the first element of this test. Wells Fargo does not challenge the sufficiency of the evidence to support the trial court's conclusion that:

> David Holm suffered panic attacks, heart problems requiring a heart monitor, high blood pressure, and daily anxiety due to the circumstances relating to the wrongful foreclosure. Plaintiff Crystal Holm testified regarding her "fear" of losing her family's home, and the impact of such a loss on her 12-year-old daughter, Liberty, and family. [She] recounted her loss of optimism regarding a property that she hoped would be populated by horses and other animals. Both Plaintiffs testified about the substantial stress on their marriage resulting from the defendants' predatory and extreme and outrageous conduct.

And Wells Fargo does not challenge the amount awarded for emotional distress.

Wells Fargo challenges only that the Holms' claim for damages for emotional distress required "medical testimony." [Appellants' Brief, p. 34] We disagree. It is true that to be compensable, emotional distress must be medically diagnosable and medically significant. *Id.*; *see also Fetick v. American Cyanamid Co.*, 38 S.W.3d 415, 419 (Mo. banc 2001). Medical testimony is not required, however, to establish that emotional

24

distress is "medically diagnosable." Rather, "whether or not [a] plaintiff's emotional distress [is] of sufficient severity to be legally cognizable is a matter for jury determination." *Medlock v. Farmers State Bank of Texas County*, 696 S.W.2d 873, 879 (Mo. App. S.D. 1985) (citing *Bass*, 646 S.W.2d at 772-73). David testified that he sought medical treatment given the stress he was experiencing due to his dealings with Wells Fargo--dealings that were not limited to negotiation of the reinstatement agreement but extended over the entire course of the foreclosure proceedings. Although the supporting evidence that the emotional distress suffered by the Holms was "medically diagnosable" could have been stronger, it was not non-existent or incredible. Rather, the emotional distress the Holms' described is readily understandable, given the frustrating circumstances they encountered in dealing with Wells Fargo and Kozeny and given all that was at stake--the loss of their home. The award of $200,000 in damages for emotional distress is supported by the evidence.

Wells Fargo also complains that none of the compensatory damages awarded the Holms were recoverable because all were special damages that were not pled in the petition as required by Rule 55.19. Count I of the Holms' petition alleged that "[a]s a direct and proximate cause" of Wells Fargo's conduct, the Holms "[have] been damaged, including but not limited to the fair market value of Plaintiff's [sic] property and lost profits, together with interest at the legal rate." The Holms prayer for judgment on Count I of the petition sought compensatory damages in a "sum [that] is fair and reasonable."

We have already concluded that the Holms were not entitled to an award for the post-foreclosure loss in value of the Property or for the value of post-foreclosure repairs

25

to the Property.  We thus limit our discussion on the subject of special damages to whether emotional distress was required to be specifically pled in the petition.

Rule 55.19 provides that "[w]hen items of special damage are claimed, they shall be specifically stated."  "The general rule is that 'general damages' are those that flow as a natural and necessary result of the act complained of and that 'special damages' are damages which actually result from the act by reason of the special circumstances of the case and not as a necessary result of the act."  *Porter v. Crawford & Co.*, 611 S.W.2d 265, 271 (Mo. App. W.D. 1980).

Emotional distress is a natural and probable consequence of wrongful foreclosure where malice and willfulness are alleged.  *See*, *e.g.*, *Medlock*, 696 S.W.2d at 880.  Here, the Holms pled that Wells Fargo's conduct as described in the petition was "intentional, knowing, willful, malicious and outrageous, and warrants an award of punitive damages." As such, Wells Fargo should and could have reasonably expected that the Holms would seek to recover damages for emotional distress as general damages as a "natural and necessary result of the act complained of."  *Porter*, 611 S.W.2d at 271; *see Fetick*, 38 S.W.3d at 419 (observing in addressing right to recover emotional distress damages that "[w]hile Fetick did not specifically plead emotional distress in his petition, he did contend, in his punitive claim, that Cyanamid acted willfully and maliciously").  The Holms were not required to plead emotional distress as special damages given their assertion in the petition that Wells Fargo acted willfully and maliciously in wrongfully foreclosing the Property.

Point three on appeal is granted in part and denied in part. The trial court's award of emotional distress damages in the amount of $200,000 is affirmed. The damage awards of $89,762.30 for the Property's post-foreclosure loss in value, and of $6,150 for the value of post-foreclosure repairs to the Property, are reversed for the reasons herein explained.

**Point Four**

In the fourth point on appeal, Wells Fargo claims it was error to deny it a jury trial on Count I of the petition because Wells Fargo did not waive its right to jury trial. This issue of first impression requires us to address the permissible impact of discovery sanctions on the right to trial by jury.

Rules 61.01(b) and (d) expressly authorize a trial court to "make such orders in regard to the failure" to make discovery "as are just," including, among others, the striking of pleadings or parts thereof, the dismissal of an action or proceeding or parts thereof, or the rendering of a judgment by default. Here, the trial court imposed harsh sanctions that struck Wells Fargo's and Freddie Mac's pleadings, denied them the right to introduce any evidence, denied them the right to cross-examine any witnesses on issues of liability and damages, and denied them the right to object to the admission of evidence on the issues of liability and damages. The trial court stopped short of entering a judgment by default against Wells Fargo and Freddie Mac. However, the practical effect of the trial court's sanctions was to permit the Holms to present their case as if the defendants were in default. *Lewellen v. Franklin*, 441 S.W.3d 136, 150 (Mo. banc 2014)

27

(holding that where pleadings were struck, and offending party was precluded from defending the plaintiff's claims, "the court, in effect, found [the defendants] liable").

Given the procedural posture of the case following the imposition of discovery sanctions, the Holms elected to waive the right to trial by jury on Count I of the petition the day before trial.[10] The next day, on the morning of trial, Wells Fargo demanded that Count I be tried to a jury. The trial court refused this request. Though the trial court did not definitively explain its ruling, it discussed at various times on the record that Wells Fargo had acted in bad faith by waiting to assert a right to jury trial on the morning of trial; that Wells Fargo never tendered proposed jury instructions though earlier required to do so, suggesting a waiver of the right to jury trial; and that the sanctions imposed against Wells Fargo warranted a denial of the right to jury trial.

When discovery sanctions include the striking of all pleadings, a prohibition against the admission of all evidence and witness testimony, and a prohibition against cross-examining witnesses or objecting to the admission of evidence, then the sanctions effectively "render the cause uncontested and subject to judgment." *Karolat v. Karolat*, 151 S.W.3d 852, 857 (Mo. App. W.D. 2004). We conclude as a matter of first impression that in such a case, although the non-offending party has the right to insist that the uncontested case proceed to trial before a jury, the offending party has no right to insist that the uncontested case be tried to a jury. *See Eidson ex rel. Webster v. Eidson*, 7 S.W.3d 495, 499 (Mo. App. W.D. 1999) (holding that "[w]hen such sanctions are

_____

[10]There was no right to trial by jury on Counts II and III of the petition, which were equitable claims to be tried to the court.

imposed [striking pleadings, and prohibiting the introduction of evidence, cross-examination of witnesses, and objections] *and trial occurs and judgment is entered*, the principles governing the appeal relate to the discretion of the trial court in the circumstances resulting in imposition of the sanctions that *renders the cause uncontested and subject to judgment*") (emphasis added).

Our conclusion intentionally mirrors the procedural effect of a default judgment entered as a discovery sanction. In such a case, "'[t]he rendition of judgment . . . for failure to obey a discovery order . . . is treated as a judgment upon trial by the court.'" *Davis v. Chatter, Inc.*, 270 S.W.3d 471, 476 (Mo. App. W.D. 2008) (quoting *Karolat*, 151 S.W.3d at 857). Certainly, if default judgment is entered as a discovery sanction, an offending party cannot successfully complain that it has been deprived of its constitutional right to trial by jury. *See Scott v. LeClercq*, 136 S.W.3d 183, 193 (Mo. App. W.D. 2004) (rejecting claim that right to trial by jury was denied when trial court imposed sanction of default judgment pursuant to Rule 61.01). We see no meaningful basis to distinguish a case where a default judgment is entered as a discovery sanction from a case where discovery sanctions strike an offending party's pleadings and operate to preclude a defense of claims asserted against the party. Though the entry of judgment against the offending party is not by default, and remains subject to the non-offending party's submission of evidence that sustains the burden of proof, the effect of the sanctions is to render the case uncontested and subject to judgment, just as with a default

judgment.[11]  As such, the offending party has no right to insist on trial by jury, having lost that right as a natural and effective consequence of the discovery sanctions.

Applied here, Wells Fargo had no right to jury trial on Count I of the Holms' petition following the discovery sanctions imposed.  The trial court did not err in refusing to submit Count I of the Holms' petition to a jury.

Point four is denied.

### Point Five

In the fifth point on appeal, Wells Fargo and Freddie Mac complain that the trial court abused its discretion in imposing sanctions because (i) they did not act in "contumacious disregard" for the trial court's authority; (ii) the Holms were not prejudiced; (iii) the sanctions were too extreme and were not tailored to the challenged discovery conduct; and (iv) the exclusion of Kozeny's testimony punished the defendants for a non-party's conduct.

"'The imposition of sanctions for a party's failure to participate in discovery, including an order denying the right to cross-examine witnesses and present defenses, is a matter within the discretion of the trial court.'"  *Davis*, 270 S.W.3d at 476 (quoting *Karolat*, 151 S.W.3d at 857).  "'The exercise of the trial court's discretion will not be disturbed on appeal unless it is exercised unjustly.'"  *Davis*, 270 S.W.3d at 476 (quoting *Karolat*, 151 S.W.3d at 857).  "'Review is limited to determining whether the trial court

---

[11]Consistent with this conclusion, the trial court addressed the import of its imposed sanctions during a January 12, 2015, pretrial conference.  In explaining why it was denying the defendants' pretrial motion to dismiss Count I of the Holms' petition, the trial court explained: "I've stricken your pleadings.  You don't--your answers are out the window.  Your defenses are out the window, okay?"  "[T]he technical term is not a default when pleadings are stricken, but I think, in effect, that's--that's what happens.  You're--you're considered--it's similar to a default of--although I believe that the plaintiffs have to present their evidence . . . ."

could have reasonably concluded as it did, not whether the reviewing court would have imposed the same sanctions under the same circumstances.'" *Davis*, 270 S.W.3d at 476 (quoting *Karolat*, 151 S.W.3d at 857).

"Rule 61.01 allows the court to impose sanctions, even severe sanctions, when there is an unreasonable lack of cooperation in discovery." *Davis*, 270 S.W.3d at 477. Based on our review of the record, we have no quarrel whatsoever with the sanctions imposed by the trial court.

Though the Holms' petition languished for more than three years, new counsel was retained and discovery commenced. Initial written discovery propounded on Wells Fargo and Freddie Mac yielded objections to nearly every discovery request. Notably, Wells Fargo and Freddie Mac were represented by Kozeny.

When the objections could not be informally resolved, the Holms filed a motion to compel discovery. The motion was granted on May 20, 2014, with the trial court admonishing the defendants that "we don't play hide the ball up here." Answers to the discovery were ordered to be provided within twenty days. The discovery sought included a copy of the written servicing agreement between Wells Fargo and Freddie Mac applicable to the Deed of Trust.

The defendants provided supplemental answers to the written discovery on June 23, 2014, a month after the May 20, 2014 discovery order, though they were required to do so within twenty days. The defendants once again objected to production of the servicing agreement, claiming it was equally accessible to the Holms via Freddie Mac's website. A golden rule letter addressing that objection resulted in the Holms

31

receiving a faulty website address from which it could not secure the servicing agreement. The Holms' repeated requests for a hard copy of the servicing agreement were unavailing.

On September 4, 2014, the Holms sent Wells Fargo a second golden rule letter requesting a correct link to the website where the servicing agreement could be found. A third golden rule letter was sent on September 17, 2014, requesting the servicing agreement in hard copy, along with other documents not yet produced as required by the May 20, 2014 court order. Wells Fargo responded that it did not maintain a hardcopy of the servicing agreement and refused to print one off for the Holms.

The Holms filed a motion for Rule 61.01(b) sanctions on October 3, 2014. ***The defendants did not file a response.*** A hearing on the motion was continued to permit the parties time to resolve their disputes, if possible. Kozeny, the defendants' attorney, agreed to work with the Holms' attorney to identify relevant links on the Freddie Mac website to access the servicing agreement, after which the defendants would print off the desired pages. That agreement was never performed.

In the meantime, on May 21, 2014, the Holms sent a second request for production of documents to Wells Fargo. The request sought documents that would verify the amount of debt allegedly owed by the Holms, including receipts for fees identified in the "reinstatement" letters that had been sent to the Holms by Kozeny prior to the foreclosure sale.

Ott, Wells Fargo's corporate representative, was initially deposed on September 16, 2014. Ott testified that Wells Fargo had receipts for all of the charges

32

billed to the Holms as reflected in the pre-foreclosure "reinstatement" letters from Kozeny and agreed that the documents had not yet been produced to the Holms. As a result, on September 17, 2014, the Holms sent yet another golden rule letter to Wells Fargo requesting the receipts. Though Kozeny advised that the documents would be provided the next day, they were not, forcing the Holms to file a second motion to compel discovery.

The second motion to compel discovery, and the still pending motion for Rule 61.01 sanctions, were argued on October 21, 2014. During that hearing, Wells Fargo agreed to supplement its responses to the document requests seeking receipts to support the fees charged to the Holms.

In the mean time, the Holms had issued a subpoena to Kozeny on October 14, 2014, seeking documents which included the receipts supporting the charges reflected in Kozeny's pre-foreclosure "reinstatement" letters to the Holms. In response to the subpoena, Kozeny retained counsel who authored a lengthy objection to the subpoena. That attorney and the Holms' attorney then agreed to a compromise that Kozeny's attorney assured he would run by his client. Thereafter, Kozeny's attorney never returned calls, nor responded to emails or letters regarding the dispute over the subpoena. At a pretrial proceeding on December 16, 2014, Wells Fargo and Freddie Mac stipulated on the record that any documents possessed by Kozeny in its capacity as successor trustee were discoverable and would be produced. Prior to that pretrial proceeding, the Holms had issued a second subpoena to Kozeny on November 24, 2014, requiring Kozeny's corporate representative to appear at a deposition on December 29, 2014. No motion for

33

a protective order or to quash the subpoena was filed. A Special Master appointed by the trial court ruled that Kozeny had been properly subpoenaed to appear for a deposition through a corporate representative. Yet, no one from Kozeny appeared at the December 29, 2014 deposition.

During these same time frames, the Holms were also struggling to secure deposition testimony from a corporate representative for Freddie Mac. A third deposition notice was issued by the Holms on November 13, 2014. Freddie Mac moved to quash the notice. The trial court overruled Freddie Mac's motion on November 18, 2014. That same day, the Holms served a fourth deposition notice on Freddie Mac, seeking the deposition of a corporate representative on December 2, 2014. No one appeared.

At the aforementioned December 16, 2014 pretrial conference, the trial court ordered Freddie Mac to appear for a deposition on Friday, December 19, 2014. Meyer appeared on that date. Importantly, Meyer testified that the servicing agreement that had been the subject of such contention throughout the course of discovery was *not* available on the Freddie Mac website as had been represented and that a hard copy was actually available in his office. Meyer said no one had ever asked Freddie Mac for a copy of the servicing agreement and confirmed that several of Freddie Mac's prior answers to discovery were false. When this testimony was later brought to the trial court's attention, the trial court said:

> Well, I'm not going to lie to you. I was surprised when I got to see the excerpts that were outlined in the motion for sanctions from Mr. Meyers [sic]. Wow. That was--kind of shook me to the shoes there that if somebody had simply asked this guy, he could have produced those documents months ago and we wouldn't be up here arguing this . . . .

34

As noted earlier, a Special Master had been appointed by the trial court to address discovery disputes. Following a lengthy meeting with the parties, the Special Master, retired Platte County Judge Abe Shafer, issued findings of fact and rulings dated December 29, 2014. The Special Master ordered the defendants to "produce all documents identified on Exhibit A (Pending Discovery Disputes) and all written responses to the pending discovery by no later than noon on Friday, January 2, 2015." Exhibit A included materials responsive to the Holms' first written discovery requests as well as more recent written discovery requests.

The Special Master also ordered that the depositions of corporate representatives for Wells Fargo and Freddie Mac be completed on January 6, 2015--a date Kozeny expressly agreed to. Ott, Wells Fargo's corporate representative, did not appear in person for her continued deposition as ordered.

The defendants did not provide the documents identified on Exhibit A by noon on January 2, 2015, as ordered by the Special Master. The unproduced documents included a Tri-Party Agreement that describes the process to be followed to transfer notes. Meyer had identified the Tri-Party Agreement as a document in Freddie Mac's files that could be produced. When Meyer appeared for his continued deposition, he confirmed the document was in his files.

Throughout the course of these protracted discovery disputes, the trial court frequently warned the defendants. We have already mentioned that in connection with the May 20, 2014 hearing, the trial court told the defendants: "Answer discovery. . . .

35

[W]e don't play hide the ball up here. . . . Just answer discovery."  During an October 21, 2014 hearing, the trial court instructed:  "Here's the deal: I ordered you to produce the document.  Produce the document. . . . Did you not understand what I said?"  The trial court went on to warn:  "[L]et me caution you, Counsel.  If I find out you're -- your -- your -- the deponent is not answering questions that they should be, the sanctions will be heavy in view of the fact that we are so close to trial. . . . I'm not into this hide-the-ball stuff."

During a November 18, 2014, hearing, the trial court told the defendants to quit throwing up discovery "roadblocks."  The trial court also warned that "sanctions could be entered at some point here . . . ," including "striking pleadings."  During the December 16, 2014 pretrial hearing, the trial court again cautioned that sanctions could be entered, including striking pleadings.  A new attorney in attendance representing Kozeny (who was himself a partner in the Kozeny firm) represented to the court that if documents had not been produced it was because the documents did not exist.  Thereafter, the Kozeny attorney who represented Wells Fargo and Freddie Mac corrected Kozeny's attorney--a contradiction that was only enhanced when the Holms' attorney read from Ott's deposition that the documents requested from Kozeny existed.  The trial court described Kozeny's attorney's statement to the contrary as an intentional misrepresentation.

On January 5, 2015, the Holms made a detailed record of the discovery disputes to that point and requested that sanctions requested in their still pending motion for sanctions be imposed.  The trial court described its reluctance to impose serious

sanctions, something it had not done in 14 years on the bench. However, the trial court advised that it felt the defendants had "backed me into a corner, out of which I cannot escape, and I think you backed the plaintiffs into that corner." The trial court then entered its order striking the defendants' pleadings. The trial court advised that is was contemplating additional sanctions and that the parties should be prepared to address sanctions at a pretrial conference scheduled on January 12, 2015, two days before trial.

During the pretrial conference on January 12, 2015, the trial court made a detailed record concerning the defendant's discovery abuses. The trial court advised that it was:

> [I]mposing sanctions because, as I've mentioned in prior appearances, it is the Court's opinion that the defendant has failed to respond to discovery requests--in accordance with the rules of discovery, they have repeatedly failed to respond to those requests even after ordered to do so.
>
> I believe they repeatedly mislead the Court and the plaintiff[s] as to the availability of certain requested documents, indicated that those documents were available on the Internet, causing Plaintiffs' counsel considerable time and effort in searching for the documentation that was not, in fact, available on the Internet.
>
> Counsel for the defense mislead this court about the existence of certain requested documents, indicated in open court that circuit--certain documents requested did not exist when, in fact, they did, which was verified by their own witness at a later date.
>
> Counsel for the defense made no effort to contact the appropriate employees from the Defendant Freddie Mac who could readily provide the documentation requested and the documentation [that] had been ordered by the Court. Defendants provided only the documents deemed appropriate rather that all of the documents ordered by the Court and/or the special master.
>
> The Court further finds that the defendants failed to provide certain documents and information ordered by the Court and/or special master even after the special master found Defendants had failed to file timely objections to the requests, and that was according to irrefutable statements

37

by Plaintiffs' counsel at a recent hearing. Defendants continued to assert previously overruled objections, such as attorney-client privilege, when refusing to properly respond to discovery or provide discovery as ordered by the Court and/or special master. The defendants generally exacerbated their noncompliance with discovery requests by what can only be described as obstinacies in providing--or, failing to produce witnesses for depositions after being specifically ordered by this court to have a crucial witness appear for a deposition. The defendants waited until the date set for a deposition to advise plaintiffs' counsel the witness would be available by telephone only. In addition, even after being specifically ordered by the special master to have another critical witness appear on a specific date and time, the witness failed to appear as ordered.

. . . .

By these actions, and those previously mentioned by the Court, and the allegations set forth in the plaintiffs' suggestions regarding the scope of sanctions which are hereby incorporated by reference in the Court's findings, the defendants have shown a contumacious and deliberate disregard for the authority of this court, both directly and through the special master. Defendants have thrown up roadblocks to the preparation of Plaintiffs' case at every stage of the discovery process by the perpetual evasiveness under--or, recalcitrance in complying with the discovery orders. I can only conclude that the defendants have engaged in a deliberate and calculated effort to prevent plaintiff[s] from preparing their case and, thus, their right to their day in court.

Many of the discovery violations by Defendants relate directly to Plaintiffs' ability to present evidence of their action under punitive damages and have resulted in a substantial prejudice and additional expense and hardship to the plaintiffs. The defendants' actions have made it virtually impossible for the plaintiffs to anticipate or prepare for any defense to this action; and to allow the defense to present evidence in any form, either through direct or cross-examination of witnesses, would violate the very foundational principles of fundamental fairness in our judicial system.

The defendants have, by their actions, attempted to make a mockery of this judicial system, and it's time to pay the piper. It's, therefore, ordered that in addition to having their pleading stricken, the defendants are prohibited from questioning, either direct or cross-examination, any witness in this case either as they may relate to the issue of liability, actual, or punitive damages.

The trial court later clarified that it would address objections at trial on a case by case basis, but that generally, the effect of the sanctions was to prohibit objections to the admission of evidence on the issues of liability and damages.

The trial court's findings are compelling and are not an abuse of discretion. We reject the defendants' contentions that they did not act in contumacious disregard for the trial court's authority; that the Holms were not prejudiced; and that the sanctions imposed were too extreme and were not tailored to the challenged discovery conduct. We also reject the claim of error associated with the exclusion of Kozeny's testimony. The exclusion of Kozeny's testimony falls within the scope of the discovery sanction prohibiting Wells Fargo and Freddie Mac from introducing any evidence and did not impermissibly punish the defendants for Kozeny's discovery misconduct.

Point Five on appeal is denied.

## Point Six

In the sixth point on appeal, Wells Fargo argues that the Holms should not have been awarded punitive damages because they failed to establish by clear and convincing evidence that Wells Fargo acted with evil motive or reckless indifference to their rights in that: (i) punitive damages cannot be imposed for a breach of contract; (ii) the servicing agreement did not create enforceable rights or require Wells Fargo to accept reinstatement funds; (iii) the evidence did not support that Wells Fargo was motivated by financial incentives to foreclose; and (iv) Amber Ott's testimony did not reflect the required culpable mental state.

39

Once again, this point relied on is impermissibly multifarious because it raises four distinct claims of error that are required to be asserted in separate point on appeal. Rule 84.04(d)(1)(A). We would be within our discretion to dismiss this point as it preserves nothing for appellate review. *Host*, 460 S.W.3d at 96 n.4. However, we will endeavor to decide the point on its merits. *J.A.D.*, 978 S.W.2d at 338.

The standard of review applicable to each of the components of this point relied on is the same as that described in point one on appeal.

The Judgment awarded punitive damages because "[t]he evidence established that Wells Fargo intentionally promised a reinstatement to Plaintiffs and told David Holm that no foreclosure sale would take place if he accepted the reinstatement. Mr. Holm immediately accepted the offer, but Wells Fargo deliberately ignored the reinstatement deal and, in an egregious and deceitful manner, intentionally foreclosed on David and Crystal Holm's family home." The balance of the Judgment's discussion of the award of punitive damages explains some of the evidence on which the trial court relied to reach its conclusion. Regardless the Judgment's discussion of the evidence, we are bound to affirm the award of punitive damages on any basis supported by the record, as no findings of fact were requested as permitted by Rule 73.01(c), and as we assume all facts to have been found in accordance with the Judgment. *Hervey*, 371 S.W.3d at 828.

Wells Fargo first complains that punitive damages were improperly awarded for a breach of contract. We disagree. When a mortgagor brings an action for wrongful foreclosure and seeks the recovery of damages at law, the action sounds in tort, not contract, even though the relationship between the mortgagor and mortgagee is one that

40

arises out of contracts--generally a promissory note and a deed of trust. *See Dobson*, 259 S.W.3d at 22 ("A tort action for damages for wrongful foreclosure lies against a mortgagee only when the mortgagor had no right to foreclose at the time foreclosure proceedings were commenced."). Punitive damages can be recovered in a wrongful foreclosure claim as in any other tort action so long as there is "a showing, by clear and convincing proof, of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." *Werremeyer v. K.C. Auto Salvage Co., Inc.*, 134 S.W.3d 633, 635 (Mo. banc 2004) (citing *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996); *Burnett v. Griffith*, 769 S.W.2d 780, 787 (Mo. banc 1989)). Here, the Holms sued for wrongful foreclosure, arguing in part that they were not in default at the time of the foreclosure sale because a reinstatement agreement had been reached.[12] Though the facts giving rise to the claim involve an agreement that was not honored, the wrongful foreclosure action pled by the Holms was for an independent, willful tort. Punitive damages are recoverable where breach of an agreement "amounts to an independent, willful tort and there are proper allegations of malice, wantonness or

---

[12]We reiterate that we have not been asked to determine in this case whether the tort of wrongful foreclosure permitting the recovery of damages at law (as opposed to an action in equity to set aside the sale) can be based on a failure to honor a reinstatement agreement reached after foreclosure proceedings have commenced. *See Dobson*, 259 S.W.3d at 22 ("A tort action for damages for wrongful foreclosure lies against a mortgagee only when the mortgagee had no right to foreclose *at the time foreclosure proceedings were commenced*.") (emphasis added); *see* note 6, *supra*. Whether the failure to honor a reinstatement agreement should be recognized as another form of "no default" that will support a tort recovery for damages, or whether that set of circumstances permits only the pursuit of a claim in equity to set aside a foreclosure as wrongful, has not been clearly addressed in Missouri. However, given the posture of this case at the time of trial in light of the imposed discovery sanctions, and given that Wells Fargo has not challenged whether the failure to honor a reinstatement agreement will permit the recovery of damages in tort for wrongful foreclosure, we do not address the issue.

41

oppression." *Smith v. American Bank & Trust Co.*, 639 S.W.2d 169, 176 (Mo. App. W.D. 1982)) (citations omitted).

Wells Fargo next complains that the servicing agreement did not require them to accept reinstatement funds. It is immaterial whether the servicing agreement required Wells Fargo to accept reinstatement funds. It is uncontested that the servicing agreement encouraged reinstatement agreements. Freddie Mac's policy of encouraging reinstatement as reflected in the servicing agreement was offered as evidence to show that by disregarding the reinstatement agreement, Wells Fargo acted outrageously and/or recklessly.

Wells Fargo next argues that the evidence did not support the conclusion that it had a financial motivation to disregard the reinstatement agreement. This argument disregards our standard of review. Wells Fargo asks us to discredit the Holms' expert witness's testimony. However, the trial court was free to accept that testimony, and thus to conclude that Wells Fargo may have been motivated not to honor the reinstatement agreement and to instead remove a "toxic" loan from its portfolio by foreclosure. *Tadych v. Horner*, 336 S.W.3d 174, 177 (Mo. App. W.D. 2011) (holding that "'the trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of the witnesses' testimony'") (quoting *Zinc v. State*, 278 S.W.3d 170, 192 (Mo. banc 2009) (other citation omitted).

Wells Fargo makes the same mistake in asking us to discredit the trial court's conclusion that Ott's testimony in which she said that she was not appearing as a human being, but instead as a representative of Wells Fargo, reflected on Wells Fargo's lack of

remorse and humanity. The trial court heard the context of this testimony and was free to draw the inference that it did. *Tadych*, 336 S.W.3d at 177.

Wells Fargo's sixth point on appeal ignores the big picture. The trial court concluded, and the record supports, that although Wells Fargo reached an agreement with the Holms to postpone the foreclosure sale based on the Holms' agreement to pay $10,306.94 to reinstate the Note, and although the Holms' performed the agreement exactly as directed by Wells Fargo and Kozeny, Kozeny proceeded with the foreclosure sale. Kozeny first claimed it did so first because the reinstatement funds were not received by noon on August 15, 2008, (though the Holms were never told they needed to be), and then claimed it did so because the funds received were in the wrong amount and not certified. The second explanation was plainly dispelled by Ott's testimony. And the trial court could have concluded that the first explanation was not credible given that the reinstatement agreement was not even reached until 7:00 p.m. the night before the scheduled foreclosure sale, given that Kozeny's offices were in St. Louis, and given that Kozeny did not call David to provide him with payment delivery instructions until after the foreclosure sale had already been conducted.

The Holms clearly and convincingly established that Wells Fargo deliberately ignored the reinstatement agreement reached with the Holms on August 14, 2008, and in the process acted intentionally, willfully, outrageously, and/or with reckless disregard for the consequences of their actions.

Point six on appeal is denied.

43

## Point Seven

In point seven on appeal, Wells Fargo argues that the punitive damage award violated its due process rights due to the sanctions imposed by the court by arbitrarily depriving it of property without being able to present defenses and that the one-sided record that resulted from the imposition of sanctions did not yield clear and convincing evidence supporting punitive damages.

The argument which follows this point on appeal is brief, is premised on Wells Fargo's contentions that discovery sanctions were erroneously imposed, and claims that the evidence supporting an award of punitive damages was not clear and convincing. We have already addressed and rejected both arguments in our discussion of points five and six on appeal.

Moreover, discovery sanctions that "destroy completely one party's case" are not an abuse of discretion, and do not violate due process, if "the errant party has shown contumacious and deliberate disregard for authority of the trial court." *S.R. v. K.M.*, 115 S.W.3d 862, 865 (Mo. App. E.D. 2003). Having found that standard was met here, Wells Fargo has no basis to complain that as a natural consequence of its errant behavior, it was deprived of the constitutional right to present a defense.[13]

Point seven on appeal is denied.

---

[13]We observe that the trial court did not enter a default judgment against Wells Fargo, though it would have had the discretion to do so pursuant to Rule 61.01. As such, the trial court's ability to enter a judgment in favor of the Holms remained subject to the Holms' introduction of evidence at trial sufficient to sustain their burden of proof. This is not a case where judgment was entered against Wells Fargo without requiring evidence sufficient to establish liability and damages.

## Point Eight

In the eighth point on appeal, Wells Fargo argues that the $2,959,123 punitive damages award is excessive because: (i) section 510.265.1 required the award to be reduced to five times the actual damage award; and (ii) the award denies Wells Fargo's constitutional right to due process because it bears no reasonable relationship to Wells Fargo's conduct and is substantially disproportionate to the compensatory damage award.

Wells Fargo's first contention is without merit. Section 510.265.1 has been determined by our Supreme Court to be unconstitutional if applied to causes of action that would have been triable to a jury in 1820 when the Missouri Constitution was adopted. *Lewellen*, 441 S.W.3d at 143-44 (citing by analogy *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633, 638 (Mo. banc 2012)). Wrongful foreclosure is a cause of action which derives out of common law principles of deceit, trespass,[14] and invasion of property ownership rights. In *Rutherford v. Williams*, 42 Mo. 18 (Mo. 1867), our Supreme Court addressed such a claim where a mortgagor contended that a mortgagee violated an agreement not to foreclose. In recognizing that such a claim invokes jurisdiction both in equity and at law, the court explained:

> The jurisdiction in equity is concurrent, in the exercise of discretion, where it is necessary and fit, and where the law cannot give so speedy and effectual a remedy, though relief may be had at law [citation omitted]. The cases illustrative of the application of this jurisdiction in equity would seem to show very clearly that the relief is confined to instances of fraud and misrepresentation by one party, touching some matter of interest, contract,

---

[14]"Fraud does not appear as a separate cause of action in Missouri cases until the mid-nineteenth century. Nonetheless, 'Missouri's common law is based on the common law of England as of 1607.' Fraud claims were historically encompassed in trespass claims, as English common law recognized actions for trespass as a means to recover for deceit." *Lewellen*, 441 S.W.3d at 143 n. 10 (quoting *Watts*, 376 S.W.3d at 638) (internal citations omitted).

45

security, mortgage, or conveyance, or property of some kind, in respect of which the other party is going to deal on the faith of representations made as to the truth of facts, whereby he is induced to act and deal not only to his own injury and loss, but to the gain of the party who makes the false representations, or practices the fraud and deceit; and in these cases relief is administered in general for the purpose of annulling the contract, conveyance, or instrument, and subjecting the property so acquired to the purpose of making such representations good, but sometimes even to compel the party to make up any deficiency in money, by way of compensation or damages, where the property itself proves insufficient, or cannot be reached. . . .

If the proofs in this case had fully sustained the petition, or shown a deliberate scheme of fraud and deceit designed to induce the plaintiff to go away in order that the defendant might get the property at a sacrifice in his absence, in violation of express promises or plighted faith, or upon false representations made, or had clearly established the fact that deceitful inducements had been held out to him, or that any such promise or understanding or misrepresentation had been made, and were acted upon by the other as the sole ground of his proceeding, with or without further proof that there had been fraudulent conduct or unfairness at the sale, and that an actual fraud had been accomplished to the injury of the plaintiff, and that by means thereof the defendant had acquired this property, we should certainly have been disposed to sustain this petition and grant such relief as the case made might justify upon the principles upon which the court acts in administering relief in such cases.

*Id*. at 25-26. Plainly, a claim of wrongful foreclosure is grounded in common law principles permitting a civil action for either damages or equitable relief. "[C]ivil actions for damages resulting from personal wrongs have been tried by juries since 1820." *Watts*, 376 S.W.3d at 638. As such, section 510.265.1 cannot be applied to impose a statutory cap on punitive damages in a wrongful foreclosure action where the mortgagor has elected to accept the result of the sale and to recover damages in an action at law.

Wells Fargo's reliance on *Federal Nat. Mortg. Ass'n v. Howlett*, 521 S.W.2d 428 (Mo. banc 1975) for the proposition that Missouri did not recognize a claim for wrongful

foreclosure in 1820 is without merit. *Howlett* addresses the legislative and judicial history of ***nonjudicial*** foreclosure pursuant to a contractually agreed upon power of sale clause in a deed of trust. *Id*. at 431. In addressing the origin of ***nonjudicial*** foreclosure, the Supreme Court observed that during the early years of statehood, Missouri statutes "provided for and authorized only judicial foreclosure." *Howlett*, 521 S.W.2d at 431 (citing RSMo 1825, p. 593). The Court also noted that "[p]reviously, the territorial laws of Missouri also provided only for judicial foreclosure." *Howlett*, 521 S.W.2d at 431 n.4 (citing Act of October 20, 1807, 1 Terr. Laws of Missouri, pp. 182-83, sections 1, 3). Plainly, an action for wrongful foreclosure exists independent of whether the foreclosure is conducted judicially or nonjudicially. *Howlett* does not address wrongful foreclosure actions in either context. However, by addressing the history of judicial and nonjudicial foreclosures in Missouri, *Howlett* underscores that the prospect of a claim for wrongful foreclosure necessarily predated the adoption of the Missouri Constitution in 1820.

We are also not persuaded by Wells Fargo's argument that because the Holms waived a right to jury trial on Count I of its petition, the holding in *Lewellen* is not controlling. The issue in *Lewellen* was whether the right to jury determination of civil damages existed as of 1820, not whether that right was exercised at the time of trial. 441 S.W.3d at 144 ("Because section 510.265 changes the right to a jury determination of punitive damages as it existed in 1820, it unconstitutionally infringes on [the] ***right*** to a trial by jury protected by article I, section 22(a) of the Missouri Constitution.") (emphasis added). To conclude otherwise would leave the application of section 510.265 to the folly of trial procedure and would reward defendants whose contumacious disregard of

47

discovery leads to a situation where a default judgment is entered, or where liability is all but determined by virtue of discovery sanctions, and a plaintiff is thus inclined to the efficiency of trying the issue of damages to the court.

Though section 510.265.1 cannot be applied to the award of punitive damages in this case, the punitive damage award is nonetheless subject to due process limitations. The United States Supreme Court has ruled that "due process rights guaranteed by the United States Constitution 'prohibit[] the imposition of grossly excessive or arbitrary punishments on a tortfeasor.'" *Lewellen*, 441 S.W.3d at 144 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003)). "Courts must review punitive damages awards and consider the reprehensibility of the defendant's misconduct, the disparity between the harm and the award, and the difference between the award and civil penalties authorized or imposed in comparable cases." *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).

"The reprehensibility of the conduct is the most important factor and includes consideration of whether:

> '[T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.'"

*Lewellen*, 441 S.W.3d at 146 (quoting *State Farm*, 538 U.S. at 419).

The harm in this case was physical, as reflected by the damages awarded to the Holms for emotional distress. And the Holms were financially vulnerable, as they faced

the loss of their family home to nonjudicial foreclosure even though they disputed the debt.

Moreover, Wells Fargo's conduct involved intentional malice, trickery, or deceit, not mere accident. Wells Fargo disregarded the Holms' attempts to explain early in the foreclosure proceedings that they were not in default and that Wells Fargo had accelerated the Note based on a mistaken belief that the Holms were evacuating the Property. When David finally reached someone at Wells Fargo with authority to discuss a resolution of the disputed debt, an agreement was reached to reinstate the Note late in the day before the scheduled foreclosure sale. Wells Fargo assured David that the sale scheduled for noon the next day would be postponed. Wells Fargo told David to contact Kozeny the next morning to confirm the reinstatement amount and to make arrangements to deliver payment to Kozeny. David did exactly as he was instructed, reaching Kozeny at 10:00 a.m. on the morning of the scheduled sale. Kozeny confirmed the reinstatement amount and that the sale would be postponed. Kozeny told David to secure a cashier's check in the agreed upon amount and to await a phone call with instructions for its delivery. Again, David did exactly as he was instructed. Kozeny called David back at 1:00 or 2:00 p.m. and instructed David to send a facsimile copy of the cashier's check to its offices and to overnight the actual check for next day delivery. Once again, David did exactly as instructed. At no point was David told by Wells Fargo or Kozeny that his cashier's check had to be received before the scheduled foreclose sale.

Though an agreement to reinstate the Note and to postpone the foreclosure sale had been reached, Kozeny proceeded with the sale as scheduled. At trial, Wells Fargo

49

claimed that payment had to be received before the scheduled sale in order to postpone the sale. However, the circumstances suggest otherwise. The reinstatement agreement was not reached until very late the night before the scheduled sale, making the prospect of delivery of payment to Kozeny in St. Louis by noon the following day unlikely. Further, had receipt of payment by noon been a requirement, then Kozeny would not have called after the scheduled sale with payment delivery instructions. And had receipt of payment by noon on August 15, 2008, been a requirement, *the scheduled sale would have been cancelled* because receipt of payment would have cured the alleged default. The concept of "postponing" the scheduled sale--a concept which Ott acknowledged was discussed--was only relevant if, as David claimed, Wells Fargo never imposed a requirement that his payment be received before the scheduled sale.

Adding insult to injury, Kozeny provided the Holms with two completely different explanations for returning their cashier's check. The first was that the payment had to be received by the time of the scheduled sale. The second was that the payment was not in the right amount and was not certified. Ott acknowledged at trial that the second explanation was completely false.

If by some chance the scheduled foreclosure sale proceeded accidentally, then it would be reasonable to conclude that Wells Fargo would have contacted Freddie Mac, the owner of the Note and the purchaser at sale, to arrange to disregard the sale as to honor the reinstatement agreement reached with the Holms. No such request was made. Yet Meyers, Freddie Mac's corporate representative, testified that Freddie Mac would have consented to such a request.

50

The trial court was left to conclude one of two things. Either Wells Fargo willfully proceeded with the foreclosure sale despite agreeing to postpone the sale, or Wells Fargo willfully refused to correct its mistake in proceeding with the scheduled sale. In either case, Wells Fargo's conduct was sufficiently reprehensible to warrant an award of punitive damages in the amount of $2,959,123.

The second standard we are to examine is "the disparity between the actual damages and the punitive damages awarded." *Lewellen*, 441 S.W.3d at 147. We have concluded that the Holms were entitled to the damage award they received for emotional distress in the amount of $200,000. We have concluded that the Holms were not entitled to the award they received for economic damages in the amount of $95,912.30. The punitive damage award of $2,959,123 yields an approximate 14.8:1 ratio between punitive damages to permissible compensatory damages. "While 'few awards exceeding a single digit ratio between punitive damages and compensatory damages . . . will satisfy due process,' greater ratios may comport with due process where 'a particularly egregious act has resulted in only a small amount of *economic* damages.'" *Id*. (quoting *State Farm*, 538 U.S. at 425) (emphasis added). This is just such a case. Wells Fargo's conduct was particularly egregious--to the extent that it warranted an award of noneconomic damages for emotional distress. Yet, as the Property wrongfully foreclosed had (apparently) no equity at the time of foreclosure, the Holms suffered no compensable *economic* loss. A double digit ratio between the punitive and compensatory damages awarded in this case is thus not plainly a violation of due process. Certainly the ratio of punitive damages to actual damages of 14.8:1 in this case is much smaller than ratios approved in other cases.

51

*See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 461 (1993) (upholding 526:1 ratio of punitive damages to actual damages); *Krysa v. Payne*, 176 S.W.3d 150, 160-62 (Mo. App. W.D. 2005) (upholding 27:1 ratio of punitive damages to actual damages); *Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, 589 (Mo. App. W.D. 2001) (upholding 66:1 ratio of punitive damages to actual damages).

The third standard we are to examine is "the disparity between the punitive damage [award] and 'the civil penalties authorized or imposed in comparable cases.'" *Lewellen*, 441 S.W.3d at 148 (quoting *Gore*, 517 U.S. at 575). We have not been afforded any argument by the parties about civil penalties, if any, to which Wells Fargo might be exposed for its conduct. That is not, however, controlling. *Lewellen*, 441 S.W.3d at 148 (holding that punitive damages awarded were not excessive even though they were substantial larger than any civil penalties that could have been awarded).

As in *Lewellen*, we have "consider[ed] all three guideposts, and the punitive damages award[] assessed against [Wells Fargo] [is] not grossly excessive considering [its] intentional and flagrant trickery and deceit employed to target . . . financially vulnerable person[s] causing [them] to lose [their home]. *Id*. The trial court did not err in denying Wells Fargo's post-trial motion to modify the Judgment by reducing the punitive damage award.

The award of punitive damages in this case did not violate Wells Fargo's right to due process. Point eight on appeal is denied.

## Conclusion

The trial court's Judgment is affirmed in part and reversed in part. The Judgment's award of compensatory damages on Count I of the petition in favor of the Holms and against Wells Fargo is reduced to $200,000 from $295,912.30.[15] In all other respects, the judgment on Count I of the petition is affirmed. The trial court's judgment on Count II of the petition quieting title in the Property in favor of the Holms as against the interests of Freddie Mac is reversed.[16]

Cynthia L. Martin, Judge

All concur.

---

[15]The reduction in compensatory damages removes from the damage award $89,762.30 (the post-foreclosure loss in value of the Property) and $6,150 (the value of post-foreclosure repairs). The effect of this modification to the Judgment is to leave intact the award of compensatory damages for emotional distress in the amount of $200,000, and the award of punitive damages in the amount of $2,959,123.

[16]For recording purposes, the Property is legally described as: "Lot Sixteen (16) in Woodrail, a Subdivision in Clinton County, Missouri, according to the recorded plat thereof."